Roy A. **MARTIN**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 10A05–0201–CR–12.

Court of Appeals of Indiana.

Dec. 18, 2002.

Transfer Denied Feb. 20, 2003.

---

Jeffrey D. Stonebraker, Jeffersonville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Grant H. Carlton, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Roy Martin was convicted of murder, a felony, following a jury trial, and was sentenced to fifty-five years incarceration. He now appeals his conviction. We affirm.

### Issues

Martin raises the following restated issues for our review:

1. Whether the trial court properly admitted into evidence a statement Martin had given to police without benefit of counsel and after charges had been filed against him;

2. Whether the trial court properly admitted into evidence testimony regarding Martin's prior possession of a handgun; and

3. Whether the trial court properly allowed the State to impeach its own witnesses.

### Facts and Procedural History

In the early morning hours of May 5, 2001, Vincent Sanders was shot multiple times and killed in the parking lot of the

Greenwood apartments in Jeffersonville. Earlier that morning, Martin and Travis Green returned to the apartment complex and Martin became angry when he learned that Sanders had been driving his car while he was gone. He told Tina Hammond that he would "merc," or murder, Sanders for what he had done. Melvin Williams was in the parking lot that morning and knew that Martin was angry. Williams was only a few feet away when Martin confronted Sanders. Williams heard gunshots and turned to see Sanders on the ground and Martin holding a gun. After the shooting, Martin told Green that he "shouldn't have done that." Tr. at 109.

The investigation focused on Martin after detectives were given his name by witnesses and told that he was upset with Sanders. An information charging Martin with murder was filed on May 17, 2001. Martin surrendered himself at a police station in Louisville, Kentucky, on May 20, 2001, where he was later questioned by and gave a recorded statement to Jeffersonville police detectives.

Martin was tried to a jury and found guilty of murder. He was sentenced to fifty-five years incarceration. Martin now appeals. Additional facts will be provided as necessary.

### Discussion and Decision

### I. Admission of Evidence

### A. Standard of Review

The admission of evidence is within the sound discretion of the trial court, and the decision whether to admit evidence will not be reversed absent a showing of manifest abuse of the trial court's discretion resulting in the denial of a fair trial. *Prewitt v. State*, 761 N.E.2d 862, 869 (Ind.Ct.App. 2002). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* In determining the admissibility of evidence, we will only consider the evidence ·in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

### B. Admission of Statement to Police

 Our analysis begins with the presumption that the defendant did not waive· his rights. *Little v. State*, 694 N.E.2d 762, 765 (Ind.Ct.App.1998). To overcome this presumption, the State bears the burden of proving that the defendant was effectively advised of his *Miranda* rights in the first instance, and then that he voluntarily and intelligently waived those rights. *Id.* Based on the totality of the circumstances, the trial court must determine whether the defendant's statements · were obtained through violence, threats, promises or other improper influences. *Hurt v. State*, 694 N.E.2d 1212, 1217–18 (Ind.Ct.App.1998), *trans. denied, cert. denied*, 525 U.S. 1008, 119 S.Ct. 525, 142 L.Ed.2d 435 (1998). Although a signed waiver is evidence of a voluntary waiver, the State, when challenged, may be required to produce additional evidence to show the voluntariness of the waiver. *Id.* If the record contains substantial evidence of probative value to support the trial court's ruling, we will affirm it. *Davies v. State*, 730 N.E.2d 726, 736 (Ind.Ct.App.2000), *trans. denied, cert. denied*, 532 U.S. 945, 121 S.Ct. 1410, 149 L.Ed.2d 352 (2001).

Martin filed a pre-trial motion to suppress his May 20, 2001, statement to police. The trial court did not rule on the motion prior to trial because there was apparently some chance that the State would not seek to introduce the statement. When it became clear during the course of the trial that the State did intend to introduce the statement, Martin again raised the suppression issue. The jury was dismissed and the trial court held a hearing on the motion, following which the motion

was denied. The statement was admitted into evidence.

The facts surrounding Martin's statement are that at the time of Sanders' murder, Martin was represented by counsel on an unrelated matter. At some point, counsel, who was out of the country, was advised via e-mail that Martin was being sought in connection with Sanders' murder. Martin's counsel was in contact with both the Jeffersonville police and Martin. When the information was filed and the arrest warrant issued, counsel contacted Martin and told him not to talk to the police until they were able to consult with one another. Martin turned himself in to the Louisville police who in turn contacted the Jeffersonville police. Martin waived extradition and the Jeffersonville police came to Louisville to pick him up. Before leaving Louisville, the Jeffersonville officers questioned Martin. Detective Scott Oliver, who was present when Martin made the statement, testified that he had heard through another detective that counsel had been in contact with that detective about Martin's case. However, Detective Oliver was not aware of the content of the discussion between counsel and the other detective, and did not remember Martin saying anything about talking to his lawyer before giving his statement. Detective Oliver further testified that he read the advice of rights form to Martin: "I sat there and showed it to him and we went over it and ... we just explain that this was a waiver that he understood his rights and ... he signed at that time." Tr. at 499. From the point at which Martin signed the advice of rights and waiver form, the statement was both video and audio-recorded.

Martin claims that the trial court erred in overruling his motion to suppress and admitting his statement into evidence for several reasons: first, that he was denied his Sixth Amendment right to counsel; second, that the record does not adequately show that he was advised of his rights; and third, that there was not a sufficient showing that his statement was voluntary. We will address each contention in turn.

### 1. Right to Counsel

▮▮▮ Martin is correct that the Sixth Amendment right to counsel attaches with the formal initiation of adversary judicial proceedings. Owens v. State, 732 N.E.2d 161, 164 n. 2 (Ind.2000). In this state, adversary judicial proceedings are begun with the filing of an information or indictment. Badelle v. State, 754 N.E.2d 510, 538 (Ind.Ct.App.2001), trans. denied (quoting Callis v. State, 684 N.E.2d 233, 238 (Ind.Ct.App.1997), trans. denied ). Both parties agree that an information had been filed and adversary proceedings had begun when Martin gave his statement to the police. However, our supreme court has held that "[r]epresentation by an attorney does not mean that law enforcement officials cannot procure a statement from a defendant without notice to the attorney." Kern v. State, 426 N.E.2d 385, 387 (Ind. 1981). Rather, that is one of the factors that should be considered when determining whether the State has met its burden of proving that the statement was voluntary. Id. Thus, the police failure to advise Martin's counsel that they would be interrogating Martin does not per se render his statement involuntary, but will be considered as a factor in our discussion below of the voluntariness of his statement.[1]

---

**1.** The supreme court stated in Kern that the practice of interrogating a defendant whom the police know to be represented by counsel without notice to that counsel is not per se impermissible. However, the court also specifically noted that it did not approve of the practice. 426 N.E.2d at 387. We, too, are concerned about the practice, but follow our

### 2. Advisement of Rights

■ Martin next claims that the State failed to prove that he was adequately advised of his rights prior to signing the waiver. When an accused is subjected to custodial interrogation, the State may not use statements stemming from that interrogation unless it demonstrates the use of procedural safeguards effective to secure the accused's privilege against self-incrimination. *Davies*, 730 N.E.2d at 733 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The *Miranda* warnings apply only to custodial interrogation because they are meant to overcome the inherently coercive and police dominated atmosphere of custodial interrogation. *Id. Miranda* requires that the accused be informed of the right to the presence and advice of counsel during custodial interrogation by the police and of the right to remain silent and that any statement he makes may be used as evidence against him. *See Wright v. State*, 766 N.E.2d 1223, 1229 (Ind.Ct.App.2002).

■ There is no question that Martin was "in custody" when he gave his statement. Charges had already been filed and an arrest warrant had been issued. The advice of rights and waiver form which was introduced into evidence in this case states as follows:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering any time until you talk to a lawyer.

**WAIVER OF RIGHTS**

I have read this statement of my rights and I understand what my rights are. I am willing to make this statement and to answer questions. I do not wish to have a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

State's Exhibit 38. The "waiver of rights" section is followed by Martin's signature and the signature of two witnesses, Detective Oliver and Major James Craig. Detective Oliver testified regarding the circumstances surrounding Martin's statement:

[State]: Prior actually to doing the statement ... had you had the opportunity to actually ... have the ... individual advised of his rights and have a chance to review that and make a decision as to whether he would give a taped statement?

[A]: Yes sir.

* * *

[A]: ... I read it to him. I sat there and showed it to him and we went over it and ... we just explain that this was a waiver that he understood his rights and ... he signed at that time.

[Defense]: Okay. Did he ask any questions about it?

[A]: Not that I remember.

[Defense]: Did he say anything about talking to his Lawyer before signing or giving you all a statement?

supreme court's lead in considering it only a factor in the totality of the circumstances.

\* \* \*

[A]: Not that I remember.

\* \* \*

[Defense]: Did you talk to [Martin] before starting the tape and if so for how long?

[A]: It was to read him his rights. I usually just, some Detectives speak with them before hand, I just if I remember correctly I try just to read them their rights. Explain their rights to them and they sign it that they understand their rights and go on with the discussion.

Tr. at 482, 499–500. Martin does point out the following from his testimony:

[Defense]: [D]id they show you the Exhibit that's been offered the interrogation and waiver interrogation advice of rights form?

[A]: All I remember him saying is this is your rights.

[Defense]: Okay did you have a chance to read and go through it?

[A]: No not that I can recall. I just signed he said this is where you sign at and I signed my name that I can recall.

Tr. at 504. However, considering only the evidence favorable to the trial court's ruling, there was sufficient evidence that Martin was advised of his rights both orally and in writing and indicated both orally and in writing that he understood those rights. Therefore, we hold that State proved that Martin was adequately advised of his rights.

### 3. Voluntariness of Martin's Statement

■ Finally, Martin challenges the voluntariness of his statement to the police. He contends that under the totality of the circumstances, including the lack of notice to his counsel, the questionable adequacy of the advisement of rights, and the circumstances in which he was questioned, the record does not unmistakably show that he gave the statement voluntarily. We disagree.

A statement is voluntary if, in light of the totality of the circumstances, it is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *Crain v. State*, 736 N.E.2d 1223, 1231 (Ind.2000). The critical inquiry is whether the defendant's statements were induced by violence, threats, promises or other improper influence. *Id.* Among the circumstances to be considered are "inconsistencies in the defendant's statement, explicit or implicit promises by police interrogators, and the coercive nature of the interrogation atmosphere." *Davies*, 730 N.E.2d at 732–33 (quoting *Patterson v. State*, 563 N.E.2d 653, 655 (Ind.Ct.App. 1990)).

■ Martin contends that he felt pressured to give a statement because he was not taken directly to jail when he surrendered but was instead taken to a detective's office where he was offered cigarettes and coffee and told by the Louisville authorities that giving a statement was the right thing to do and if he just told the truth, he would probably go home. We acknowledge that Martin had already been charged with the crime when he gave his statement and thus, he was not free to go once surrendering to police on the warrant. However, Martin's testimony shows that he had a lawyer when he surrendered, had consulted with his lawyer prior to surrendering, and had been told by his lawyer not to give a statement until they were able to meet. The offer of cigarettes, coffee, and a comfortable place to wait for the Jeffersonville detectives to arrive does not amount to police coercion. *See French v. State*, 540 N.E.2d 1205, 1207 (Ind.1989) (holding that defendant's statement properly admissible where defendant treated

kindly and politely, was allowed to use the bathroom, was given water, and was allowed to take breaks while giving his statement). Moreover, it has been consistently held that vague and indefinite statements by the police about it being in the best interest of the defendant for him to tell the real story or cooperate with the police are not sufficient inducements to render a subsequent confession inadmissible. *Massey v. State*, 473 N.E.2d 146, 148 (Ind.1985). Martin was not subjected to a lengthy interrogation, as the total elapsed time between the advisement and waiver of rights and the end of the statement appears to be less than one hour. Martin makes no allegations of physical abuse or other coercive action by the police. The record contains substantial probative evidence sufficient to establish beyond a reasonable doubt that Martin gave a voluntary statement, and there is no evidence of improper police influence in obtaining the statement. Thus, the trial court did not abuse its discretion in admitting the statement into evidence over Martin's objection.

### C. Evidence of Prior Possession of a Handgun

■■■ Martin next contends that the trial court erred in admitting into evidence testimony from several witnesses who, although denying on cross-examination that they saw Martin with a gun around the time of the shooting, stated on re-direct that they had seen Martin with a gun in his possession on prior occasions.

Martin was charged with killing Sanders by shooting him with a nine millimeter handgun. The murder weapon was never found. On cross-examination, Martin's counsel asked several of the State's witnesses if they had seen Martin with a gun on the day of the shooting. They each replied that they had not. In each instance, the State then sought and was granted permission to question the witnesses on re-direct about whether they had ever known Martin to carry a gun. The trial court ruled that Martin's counsel had "opened the door" to such inquiry with his questions.[2]

Martin contends that his counsel's questions were carefully crafted to be limited in scope and did not "open the door" to character evidence. Assuming without deciding that allowing the State's questions and the answers thereto was error in that whether or not Martin carried a gun on other occasions was irrelevant to the issue of whether or not he was armed on the day in question, we hold that the error was harmless. The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction. *Bocko v. State*, 769 N.E.2d 658, 665 (Ind.Ct.App.2002), *trans. denied* (citing *Cook v. State*, 734 N.E.2d 563, 569 (Ind.2000)).

Tina Hammond testified that when Martin came back from Louisville and discovered that Sanders had taken his car, he was mad at Sanders and told Hammond that he would "merc," or kill, Sanders. Iman Jackson testified that she saw a group including Martin and Sanders in the

---

**2.** Martin asked for a mistrial after Jackson's testimony, contending that his questions had not opened the door to the State's investigation into whether Martin had carried a gun on occasions other than the day in question. The motion was denied. Although Martin mentions in his brief that he "believes that under the circumstances of this case a mistrial was warranted," Brief of Appellant at 24, he does not advance a separate argument based upon the denial of his motion for mistrial. Accordingly, we have limited our discussion to the admission of evidence.

parking lot as she went into her apartment that morning. She then heard three gun shots and opened the door of her apartment to see "flames" in the middle of the group of people. She did not see a gun or who was holding it. Melvin Williams testified that he was aware that Martin was upset with Sanders because Sanders had taken his car. Williams further testified that he was in the group of people Jackson referenced and that he saw Martin shoot Sanders.[3] Finally, Travis Green testified that after the shooting, Martin said to him that he "shouldn't have done that." Tr. at 109. Based upon this evidence alone, the jury could have reasonably believed that Martin was the shooter, even without hearing evidence that he had been known to carry a gun in the past. Accordingly, any error in the admission of the evidence of which Martin complains was harmless.

## II. Impeachment

■ Martin also contends that the trial court erred in allowing the State to impeach its own witnesses with their prior statements in violation of the holding of *Appleton v. State*, 740 N.E.2d 122 (Ind. 2001).

■ The State used prior statements from several of its witnesses as impeachment evidence throughout its case-in-chief. Under our rules of evidence, a party may impeach a witness by extrinsic evidence of a prior inconsistent statement. Ind. Evidence Rule 613(b). However, a party is forbidden from placing a witness on the stand when the sole purpose for doing so is to present otherwise inadmissible evidence cloaked as impeachment. *Appleton*, 740 N.E.2d at 125. Moreover, "once a witness has admitted an inconsistent prior statement she has impeached herself and further evidence is unnecessary for impeachment purposes." *Pruitt v. State*, 622 N.E.2d 469, 473 (Ind.1993).

In *Appleton*, one of the witnesses gave a pre-trial statement implicating the defendant in a crime. At trial, however, he repudiated his earlier statement, denying that the defendant had even been present during the incident. The State then read direct quotes from the witness' pretrial statement and inquired about the accuracy of those declarations. On appeal, the defendant contended that the trial court erred in permitting the State to "impeach" its witness in such a way. The supreme court noted that "[b]y reciting excerpts of [the witness'] pretrial statement and asking [him] if he made these declarations, the State might as well have played an audiotaped version of [his] statement to the jury." 740 N.E.2d at 125. Once the witness denied the defendant's involvement, the appropriate procedure would have been to make the witness aware of specific portions of his testimony that were inconsistent with his pre-trial statements and give him the opportunity to explain the inconsistency.

Once [the witness] admitted he made a police statement prior to trial that was inconsistent with his testimony . . . , impeachment was complete. [H]e had ad-

---

3. Martin notes that Williams was incarcerated at the time of trial and that this would raise some questions concerning Williams' credibility because one could speculate that he was attempting to secure a more favorable resolution to his own case by agreeing to testify against Martin. Brief of Appellant at 25. However, as Martin also notes, the jury was aware that Williams was incarcerated. Moreover, Martin points out that although Williams gave a statement to police in the days immediately following the shooting implicating Martin in the shooting, he later gave Martin's counsel a handwritten statement denying that he saw the shooting. However, Williams testified at trial that he had in fact seen Martin shoot Sanders and that he gave the contradictory statement because he did not want to testify. Any credibility issues were for the jury to resolve.

mitted himself a liar. Reciting segments of [his] pretrial statement was thus superfluous. The only purpose such recitation could have would be to get the details of [the witness'] former statement before the jury as substantive evidence . . . .

*Id.* at 126. Despite holding that the jury heard evidence it should not have due to the State's line-by-line recitation of the witness' pretrial statement, the same evidence was properly before the jury through another witness and thus, the error was harmless. The supreme court noted, however, that "[w]hile the error was harmless in this instance, it might lead to reversal under different facts." *Id.* at 127.

Martin contends that the facts of this case are such that reversal is warranted. Although we express concerns about the method of questioning employed in this case, we, too, hold the error to be harmless.[4]

Although Martin complains of the State's examination of several of its witnesses, we examine in detail here only the most serious case of improper impeachment.[5] Travis Green was called as a witness by the State. He was with Martin when Martin returned to the Greenwood apartments and discovered that Sanders had taken his car. The transcript reflects two pages of introductory questions and answers about Green's name, his acquaintance with Martin, and where he was on the day of the incident. The State then engaged in the following questioning:

[Q]: Okay, now on Thursday, May 10th . . . did you have the opportunity to

actually speak with Detective Thompson?

[A]: Yes.

[Q]: And do you recognize Detective Thompson to be here?

[A]: Yes.

[Q]: Okay, are you aware that on that day you actually, he asked you questions and you gave a taped recording about what you knew about May 5th, is that correct?

[A]: Yes.

[Q]: And have you had a chance to look at that statement?

[A]: I seen it, I didn't even bother to read it though.

\* \* \*

[Q]: Okay, would you like a chance to read it? Because you know I am going to be asking you several questions about that correct?

[A]: Yes.

[Q]: And it's sort of important that you would know or at least maybe you could make sure this is the right statement.

Tr. at 56–57. At that point, Martin objected. Although instructing the State that it needed to ask some questions to lay a foundation to show the need for the statement, the trial court nonetheless allowed the State to liberally refer to Green's prior statement. Several pages into the transcript, the State asked the following:

[Q]: Now, you have already given a statement on May 10th telling Detective Thompson what you remembered then, right?

[A]: Yeah.

---

**4.** Martin also moved for a mistrial on this basis. He does not present to us a separate argument regarding the denial of that motion.

**5.** Martin also complains that the State improperly questioned its witnesses Elishia Cheatem, Tina Hammond, and Iman Jackson.

To the extent the State improperly questioned any of these witnesses, the questioning was brief and not always met by an objection from Martin. We do not find that the State used any of these witnesses to improperly introduce evidence.

[Q]: Okay, now that was five days from when the man was shot, correct?

[A]: Uh huh.

[Q]: And your memory was probably better then than it is now, isn't it?

[A]: Then, yes.

Tr. at 65–66. The State then basically proceeded through Green's prior statement, asking questions in the form of "Did you tell Detective Thompson ... ?" or "Do you remember telling Detective Thompson ... ?". When Martin objected to the leading nature of the questioning, the State asked for and was granted permission to treat Green as a hostile witness.

■■■ We see two basic problems with the way the State conducted its direct examination of Green. First, the State wanted Green to review his statement without any showing first that he had no memory of the events reflected therein.[6] Thus, it was not properly admitted as a recorded recollection. Moreover, the State did not allow Green to merely testify as to his memory of events and upon hearing an inconsistency between his present testimony and his prior statement, use the statement for impeachment purposes. Rather, the State basically led Green through his prior statement and in that way, used the statement as substantive evidence rather than impeachment evidence. We agree with Martin that this was improper. The trial court should not have allowed the State to conduct its direct examination of Green in this way.[7]

However, Green was not a witness to the actual shooting, but only to the events preceding the shooting, and the State produced and properly questioned other witnesses who also testified that Martin was upset with Sanders because Sanders had taken his car. In addition, the State produced and properly questioned an eyewitness to the shooting. Thus, the error is deemed harmless and does not warrant reversal in this case.

### Conclusion

The trial court did not commit reversible error in its admission of evidence. Moreover, although the State was allowed to improperly impeach one of its witnesses, the error is harmless. Accordingly, Martin's conviction is affirmed.

Affirmed.

RILEY, J., and MATTINGLY–MAY, J., concur.

---

**6.** The State was unable to accomplish this because Green indicated that he was unable to read. However, when the court adjourned for the day in the middle of Green's testimony, the State was allowed to play the audiotape of Green's statement for him prior to resuming his testimony the next morning.

**7.** Although we hold the error in allowing the State to proceed as it did was harmless, we do have some concerns about what the State's tactics in this case demonstrate about its intent behind calling Green as a witness. However, we are unable to say that the State's sole purpose in calling Green was to impeach him and introduce otherwise inadmissible evidence.