## FOR PUBLICATION

FILED

Dec 19 2014, 10:16 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK LEEMAN**
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHRISTOPHER DUNCAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  09A05-1312-CR-613 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CASS CIRCUIT COURT
The Honorable Leo T. Burns, Judge
Cause No. 09C01-1108-FA-010

**December 19, 2014**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Christopher Duncan appeals following his convictions of class C felony Attempted Battery by Means of a Deadly Weapon,[1] class D felony Identity Deception,[2] class D felony Pointing a Firearm,[3] class D felony Possession of Marijuana,[4] and class D felony Resisting Law Enforcement.[5] Duncan presents the following restated issues for our review:

1. Did the trial court abuse its discretion in admitting certain evidence?

2. Did the State present sufficient evidence to support Duncan's identity deception conviction?

3. Do Duncan's convictions of attempted battery by means of a deadly weapon, pointing a firearm, and resisting law enforcement violate principles of double jeopardy?

We affirm in part, reverse in part, and remand with instructions.

On August 15, 2011, Indiana State Trooper Joshua Rozzi was on patrol in Logansport in his marked police cruiser. At around 10:30 p.m., after witnessing a vehicle

---

[1] Ind. Code Ann. § 35-42-2-1 (West, Westlaw 2011) (battery); Ind. Code Ann. § 35-41-5-1 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) (attempt). Effective July 1, 2014, battery with a deadly weapon was reclassified as Level 5 felony. Because the offense in this case was committed prior to that date, it retains its prior classification as a class C felony.

[2] Ind. Code Ann. § 35-43-5-3.5(a) (West, Westlaw 2011). Effective July 1, 2014, the offense was reclassified as a Level 6 felony. Because the offense in this case was committed prior to that date, it retains its prior classification as a class D felony.

[3] Ind. Code Ann. § 35-47-4-3 (West, Westlaw 2011). Effective July 1, 2014, pointing a firearm was reclassified as a Level 6 felony. Because the offense in this case was committed prior to that date, it retains its prior classification as a class D felony.

[4] Ind. Code Ann. § 35-48-4-11 (West, Westlaw 2011). Effective July 1, 2014, this offense was reclassified as a Level 6 felony. Because the offense in this case was committed prior to that date, it retains its prior classification as a class D felony.

[5] Ind. Code Ann. § 35-44-3-3 (West, Westlaw 2011). Effective July 1, 2014, this offense has been reclassified as a Level 6 felony. Because the offense in this case was committed prior to that date, it retains its prior classification as a class D felony.

2

turn without signaling, Officer Rozzi activated his emergency lights and initiated a traffic stop. When Officer Rozzi approached the vehicle, he detected the odor of burnt marijuana. He then made contact with the female driver and male passenger, neither of whom were able to provide identification. The woman identified herself as Gerrie Walker and the man identified himself as George F. Walker, although he was later identified as Duncan. Officer Rozzi returned to his car to run the names he had been given and to call for a canine handler.

Sergeant John Rogers of the Logansport Police Department, a canine handler, arrived within three or four minutes of Officer Rozzi's call. Upon arriving at the scene, Sergeant Rogers conferred with Officer Rozzi, and it was agreed that Trooper Rozzi would take the female driver back to his car while Sergeant Rogers dealt with Duncan. As Sergeant Rogers reached the passenger door of the stopped vehicle, he saw that Sergeant Travis Yike and Officer Nathan Garrison, both of the Logansport Police Department, had arrived and were standing on the sidewalk. Sergeant Rogers also detected the odor of burnt marijuana, and he tapped on the door and asked Duncan to step out of the car. Duncan complied, and when asked if there was anything illegal in the car, responded "Not that I know of." *Transcript* at 199. At that point, Duncan turned and began walking away from Sergeant Rogers. Duncan disregarded Sergeant Rogers's repeated commands to stop, and instead began to run. Sergeant Rogers, Sergeant Yike, and Officer Garrison all gave chase.

When the foot pursuit began, Sergeant Rogers drew his TASER and readied it for use. As Duncan reached the other side of the street, Sergeant Rogers saw the flash of a

3

gun being fired over Duncan's left shoulder and felt a projectile whiz past the left side of his face. Sergeant Rogers then deployed his TASER and the probes lodged in Duncan's back. Duncan immediately fell to the ground, and as he did so, Sergeant Rogers saw a black handgun fall to the ground. Sergeant Rogers placed his foot on the gun and called out "10-32," which is the police code for a gun. *Id.* at 211. Later inspection revealed that the gun was a 9 mm Hi-Point handgun.

Duncan was then transported to the local jail and booked. During the book-in procedure, he again identified himself as "George Walker, Jr." and gave a date of birth of April 6, 1967. When Officer Chad Wagner, who transported Duncan to jail, observed signs of intoxication and asked Duncan if he had been drinking, Duncan responded he had not been drinking, but that he had been smoking marijuana. Additionally, when Duncan overheard Officer Wagner and another officer discussing what charges to list on the jail intake form, Duncan stated that he thought the gun was a BB gun, and that if he had known it was a real gun, he would have turned around and shot at the officers. Officer Wagner later discovered Duncan's true identity. Additionally, when police searched the car in which Duncan had been a passenger, they discovered a bag under the passenger seat containing rolling papers, flavored cigar wraps used for rolling marijuana, numerous partially burnt marijuana cigarettes, and 39.53 grams of marijuana.

A few days after his arrest, Duncan placed a phone call to Gerrie Walker from the jail. Based on that phone conversation, police obtained a search warrant for a vacant house owned by Donald Vernon, Gerrie's stepfather. Inside the garage, police found a black backpack and two black suitcases. In the bags, the officers found Duncan's social

4

security card and birth certificate, along with two marijuana pipes, a marijuana grinder, cigar wraps used for rolling marijuana, a small amount of marijuana, and a bag containing over 80 rounds of 9 mm ammunition.

As a result of these events, Duncan was charged as follows: Count I, attempted murder, a class A felony; Count II, attempted aggravated battery, a class B felony; Count III, attempted battery by means of a deadly weapon, a class C felony; Count IV, identity deception as a class D felony; Count V, pointing a firearm as a class D felony; Count VI, possession of marijuana as a class D felony; and Count VII, resisting law enforcement as a class D felony. A seven-day jury trial commenced on October 28, 2013. Duncan's defense at trial was that he did not intentionally fire at the officers, but that his hands had clenched as a result of being stunned by the TASER, causing him to involuntarily pull the trigger. At the conclusion of the evidence and argument, the jury acquitted Duncan of Counts I and II and convicted him of the remaining counts. Duncan was sentenced to an aggregate term of thirteen years executed. Duncan now appeals.

1.

Duncan first argues that the trial court erred in admitting into evidence the marijuana, drug paraphernalia, and ammunition discovered in the bags located in Donald Vernon's garage. The decision to admit or exclude evidence lies within the trial court's sound discretion. *Filice v. State*, 886 N.E.2d 24 (Ind. Ct. App. 2008), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Dixon v. State*, 967 N.E.2d 1090 (Ind. Ct. App. 2012). We will not reverse absent a showing of manifest abuse of discretion resulting in

5

the denial of a fair trial. *Johnson v. State*, 831 N.E.2d 163 (Ind. Ct. App. 2005), *trans. denied*. Moreover, even if the trial court abuses its discretion in admitting evidence, we will leave the judgment undisturbed if the error was harmless. *Granger v. State*, 946 N.E.2d 1209 (Ind. Ct. App. 2011).

Duncan argues that the evidence recovered from Vernon's garage "was irrelevant as it did not prove nor disprove what had actually happened." *Appellant's Brief* at 17. According to Duncan, "[t]his case was about whether [Duncan] either intentionally fired a firearm at police or involuntarily fired the gun after being stunned by a TASER." *Id.* Duncan argues further that any probative value the evidence possessed was substantially outweighed by the danger of unfair prejudice. Duncan contends that the evidence "only served to inflame the passions of the jury by giving the impression that [Duncan] was a dangerous man associated with drugs and large amounts of ammunition." *Id.* at 17-18.

Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. Ind. Evidence Rule 401. As a general matter, relevant evidence is admissible, and irrelevant evidence is not. Ind. Evidence Rule 402. A trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice. Ind. Evidence Rule 403. "The danger of unfair prejudicial impact arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury." *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *trans. denied*.

6

We first address Duncan's arguments concerning the admission of the ammunition. With respect to relevance, Duncan asserts that "the ammunition had nothing to do with any issue in this case at all[.]" *Appellant's Brief* at 17. We disagree. The ammunition found in Vernon's garage was the same caliber as the ammunition in the gun used in the commission of this crime. Moreover, the ammunition in the gun and the ammunition in the backpack bore the same manufacturer's stamp depicting the words "WIN" and "9mm LUGER." *See Exhibit Volume* at 30, 90; *Transcript* at 802. The presence of this ammunition in a bag containing Duncan's social security card and birth certificate makes it more likely that Duncan possessed the gun and loaded it, both facts that were relevant to the charges in this case.[6] Moreover, after his arrest, Duncan told Officer Wagner that he believed the weapon was a BB gun and "if he had known that it was a real gun he would have turned around and faced the officer shooting at them." *Transcript* at 518. The presence of the ammunition among Duncan's personal effects is relevant to establish that Duncan knew that the gun was a 9mm and not a BB gun.

Duncan seems to argue that the universe of relevant evidence was narrowed by his theory of defense. Specifically, he suggests that the ammunition became irrelevant because he did not dispute that he possessed the gun or that he knew it was loaded, but instead only contested whether he voluntarily pulled the trigger. Regardless of Duncan's theory of defense, however, the State was required to prove each element of the charged

[6] In his reply brief, Duncan claims that "there was no clear evidence that the ammunition was Duncan's" because the ammunition was found in close proximity not only to documents identifying Duncan, but also a GED belonging to Ruby Harmon Ehler and a death certificate for Patsy Harmon. *Reply Brief* at 4. This argument goes to the weight to be attributed to the ammunition, not its admissibility.

offenses beyond a reasonable doubt. Duncan has not directed our attention to any stipulations in the record concerning his possession of the gun or his knowledge that it was real and loaded. Moreover, even if we consider Duncan to have conceded these points, it is well settled that the State is entitled to prove its case by evidence of its own choice, and a defendant may not stipulate his way out of the full evidentiary force of the case to be presented against him. *State v. Lewis*, 883 N.E.2d 847 (Ind. Ct. App. 2008). The trial court did not abuse its discretion in concluding that the ammunition was relevant.

Nor can we conclude that the trial court abused its discretion in overruling Duncan's objection based on Evid. R. 403. Again, Duncan asks us to weigh the probative value of the evidence in light of his theory of defense—i.e., that he did not dispute his possession of the gun. This court has explained, however, that "[a] defendant's objection pursuant to Rule 403 of the Indiana Rules of Evidence and his offer to concede a point generally cannot prevail over the government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." *Kellett v. State*, 716 N.E.2d 975, 979 (Ind. Ct. App. 1999); *see also Perigo v. State*, 541 N.E2d 936 (Ind. 1989) (rejecting defendant's argument that the court should consider an offer of stipulation in the balancing test of relevancy versus prejudicial effect). Moreover, we do not believe the ammunition posed anywhere near the risk of unfair prejudice Duncan claims. Eighty-four 9mm cartridges were found in Vernon's garage among Duncan's personal effects; this does not strike us as an extraordinary amount of ammunition. We also note that the ammunition was the same caliber and type as that found with the gun

8

used in the commission of these offenses.  Thus, the presence of the ammunition did not suggest ownership of more than one gun.  We cannot conclude that this evidence was likely to inflame the passions of the jury.  The trial court did not abuse its considerable discretion in weighing the probative value of the ammunition against the risk of unfair prejudice.  *See Lashbrook v. State*, 762 N.E.2d 756, 759 (Ind. 2002) (noting that "[t]rial courts are given wide latitude in weighing probative value against the danger of unfair prejudice, and we review that determination for abuse of discretion").

With respect to the marijuana and paraphernalia recovered from Vernon's garage, we conclude that any error in the admission of this evidence was harmless.  "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party."  *Corbett v. State*, 764 N.E.2d 622, 628 (Ind. 2002).  In determining whether an error in the admission of evidence affected a defendant's substantial rights, we "must assess the probable impact of that evidence upon the jury."  *Id.*  "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction."  *Sisson v. State*, 985 N.E.2d 1, 15 (Ind. Ct. App. 2012) (quoting *Martin v. State*, 779 N.E.2d 1235, 1242 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied.*

The complained-of evidence consists of a very small amount of marijuana, cigar wraps, and two marijuana pipes and a marijuana grinder with marijuana residue on them. In light of other evidence presented in this case, we are satisfied that there is no

substantial likelihood that the challenged evidence contributed to Duncan's convictions. The marijuana discovered in the vehicle on the date of Duncan's offenses, which formed the basis of Duncan's conviction for possession of marijuana, was found under the front passenger seat where Duncan had been sitting. Additionally, when police attempted to question Duncan, he fled and discharged a firearm in their direction. Officer Wagner, who transported Duncan to jail, testified that Duncan had glassy eyes, slurred speech, and appeared to be intoxicated during the booking process. When Officer Wagner asked Duncan if he had been drinking, Duncan responded in the negative, but said that he had "smoked a bunch of marijuana." *Transcript* at 521. In light of this evidence, which was more than sufficient to establish Duncan's constructive possession of the marijuana found in the car, *see*, *e.g.*, *Holmes v. State*, 785 N.E.2d 658 (Ind. Ct. App. 2003) (finding sufficient evidence of passenger's constructive possession where marijuana was found within defendant's reach and defendant attempted to flee from the police), we think it highly unlikely that evidence that Duncan possessed paraphernalia and a very small amount of marijuana at another time and in another place contributed to his conviction for possessing the marijuana found in the car. We think it even less likely that this evidence contributed to Duncan's other convictions, none of which were drug-related. We therefore find any error in the admission of the paraphernalia and marijuana found at Vernon's residence harmless.[7]

---

[7] We note that Duncan argues that the jury reached inconsistent verdicts by acquitting him of attempted murder and attempted aggravated battery, but convicting him of attempted battery by means of a deadly weapon and pointing a firearm. According to Duncan, this purported inconsistency is indicative of a compromise verdict, which Duncan claims is evidence that he was prejudiced by the admission of the evidence found in Vernon's garage. Duncan offers no argument or authority in support of his bald

2.

Next, Duncan argues that the State presented insufficient evidence to support his identity deception conviction. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Atteberry v. State*, 911 N.E.2d 601 (Ind. Ct. App. 2009). Instead, we consider only the evidence supporting the conviction and the reasonable inferences to be drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the judgment will not be disturbed. *Baumgartner v. State*, 891 N.E.2d 1131 (Ind. Ct. App. 2008).

In order to convict Duncan of identity deception as charged, the State was required to prove that Duncan

> knowingly or intentionally obtain[ed] . . . or use[d] the identifying information of another person, including the identifying information of a person who is deceased:
> (1) without the other person's consent; and
> (2) with intent to . . .
> (C) profess to be another person[.]

I.C. § 35-43-5-3.5 (West, Westlaw 2011). "Identifying information" is defined in relevant part as "information that identifies a person, including a person's . . . name, address, date of birth, place of employment, employer identification number, mother's

---

assertion that the verdicts were, in fact, inconsistent. We decline to develop this argument on Duncan's behalf; accordingly, it is waived for lack of cogency. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (noting that "[a] party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record"), *trans. denied*.

11

maiden name, Social Security number, or any identification number issued by a governmental entity[.]" Ind. Code Ann. § 35-43-5-1(i) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). In this case, the State charged Duncan with identity deception for using the identifying information of George Frederick Walker. Relying on *Brown v. State*, 868 N.E.2d 464 (Ind. 2007), Duncan argues that the evidence was insufficient to support his identity deception conviction because there was no evidence that George Frederick Walker was an actual person. We agree.

In *Brown v. State*, the defendant was convicted of three counts of identity deception after a series of incidents in which he telephoned three adult men and, pretending to work for a radio station, told them about a phony radio contest in which they could win prizes if they would drive to a specific address (which turned out to be the defendant's residence), enter, remove all their clothing, and don a T-shirt. All of the men went to the address, and two of them carried out the remaining instructions. In concluding that the evidence was insufficient to support the identity deception convictions, our Supreme Court cited an earlier version of I.C. § 35-43-5-1 that defined the phrase "identifying information" as set forth above, except that the word "individual" was used in place of "person." *Brown v. State*, 868 N.E.2d at 469. The court first explained that "[t]he word 'individual' is commonly understood to refer to a single human being, in contrast to 'person,' which can mean either an individual human being or a corporation or other legal entity." *Id.* at 469-70 (footnotes omitted). The court went on to explain that the defendant spoke to three people about the phony contest, and each

12

time identified himself as a representative of a corporation (i.e., a radio station), and at least once claimed to be "Scott Ross." *Id.* at 470. The court dismissed the idea that use of the name "Scott Ross" was sufficient to support an identity deception conviction, noting that it "was a fictitious name created by the defendant and did not coincide with any real person." *Id.* The court further concluded that "[w]hile there was evidence that the defendant used information identifying the corporate radio station without its consent, there was no evidence that he used the name, address, date of birth, or other identifiers of any existing human being in perpetrating his hoax." *Id.*

Shortly after our Supreme Court's decision in *Brown v. State*, the General Assembly amended the definition of "identifying information" to replace the word "individual" with the word "person." I.C. § 35-43-5-1. It seems likely to us that the legislature did so in response to *Brown*, and for the specific purpose of bringing corporations and other legal entities within the statute's ambit. *See Brown v. State*, 868 N.E.2d at 469-70 (explaining that person may refer to "either an individual human being or a corporation or other legal entity" (footnote omitted)). But we do not believe that this alters our Supreme Court's holding that in order to support an identity deception conviction, the State must establish that the defendant used the identifying information of a real person, whether natural or juridical. Indeed, the plain language of the identity deception statute requires the knowing or intentional use of the identifying information "of another person." I.C. § 35-43-5-3.5. As our Supreme Court explained in *Brown*, the identity deception statute does not criminalize the use of a fictitious name.

13

The State does not dispute that there was no evidence presented that George Frederick Walker was a real person. Instead, the State argues that it was not necessary for the State to present such evidence. Specifically, relying on subsection I.C. § 35-43-5-3.5(d), which provides that "it is not a defense in a prosecution under [the identity deception statute] that no person was harmed or defrauded", the State argues that the legislature did not intend to limit convictions only to cases in which an individual was actually harmed. We do not disagree with the State's assertion, but it does not alter our conclusion. While the statute clearly does not require actual harm to any person, it does require the use of an actual person's identifying information. We also note that this language was part of the statute at the time our Supreme Court decided *Brown*, and the court apparently did not interpret it in the manner urged by the State.

The State argues further that Duncan's conduct in giving a false name should be criminalized because it "ran the risk of impeding the police investigation and the State's prosecution" and the "practice of obstructing the course of justice is one which society has an interest in stemming." *Appellee's Brief* at 21. This may be true, but it is not our prerogative as an appellate court to identify and criminalize undesirable behavior; such policy decisions are reserved for the legislative branch of our state government. This court is bound by the language of the statute as written and our Supreme Court's precedent. Moreover, we note that the identity deception statute is found in article 43 of Indiana's criminal code, which is titled "Offenses Against Property." It is therefore apparent to us that the identity deception statute is directed toward potential fraud and

14

property crimes and not false reporting or obstruction of justice. Whether Duncan's conduct might have been chargeable under another statute is not an issue before us.

In this case, Duncan used the name George Frederick Walker, George Walker, Jr., and/or George F. Walker, and gave a birth date of April 6, 1967. The state presented no evidence to establish that this information "coincide[d] with any real person." *See Brown v. State*, 868 N.E.2d at 470. In other words, the State presented no evidence to support a conclusion that Duncan knowingly or intentionally used the identifying information of "another person." I.C. § 35-43-5-3.5. Accordingly, the State presented insufficient evidence to support Duncan's identity deception conviction. We therefore reverse that portion of the trial court's judgment and remand with instructions to vacate the identity deception conviction and the sentence imposed thereon.[8]

3.

Finally, Duncan argues that his convictions of attempted battery by means of a deadly weapon, resisting law enforcement, and pointing a firearm violate principles of double jeopardy. The double jeopardy clause found in article 1, section 14 of the Indiana Constitution "was intended to prevent the state from being able to proceed against a person twice for the same criminal transgression." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). Two or more offenses are the "same criminal transgression" for the purposes of the Indiana double jeopardy clause if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential

---

[8] Because Duncan was ordered to serve his sentence on the identity deception conviction concurrent with the attempted battery by means of a deadly weapon conviction, his aggregate sentence will not be affected.

15

elements of one challenged offense also establish the essential elements of another challenged offense." *Id.*

In this case, Duncan challenges his convictions under the actual-evidence test, which "prohibits multiple convictions if there is 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Davis v. State*, 770 N.E.2d 319, 323 (Ind. 2002) (quoting *Richardson v. State*, 717 N.E.2d at 53). Establishing a "'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility." *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008). Instead, the existence of a reasonable possibility "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id.* In applying this test, we seek to "identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination." *Id.* at 832.

To prove that Duncan committed attempted battery by means of a deadly weapon, the State was required to prove that he knowingly or intentionally engaged in conduct constituting a substantial step toward touching another person in a rude, insolent, or angry manner by means of a deadly weapon. *See* I.C. § 35-42-2-1; I.C. § 35-41-5-1. The charging information was mainly a recitation of the applicable statutory language, with the added details that Sergeant Rogers was the individual Duncan attempted to touch and

16

that the deadly weapon used was a 9mm Luger.  In the final jury instructions, it was specifically alleged that shooting the firearm at Sergeant Rogers was the substantial step toward the commission of battery with a deadly weapon.  In closing arguments,[9] the State had the following to say concerning the evidence on this charge:

> In order to prove him guilty beyond a reasonable doubt I have to show you, one, the defendant,--again we know it's Chris Duncan on August 15, 2011, he had that gun, was fleeing from police officers, two, acting with the culpability required to commit the crime of battery by means of a deadly weapon, which is defined as knowingly or intentionally. . . .  And again, I submit to you that this was not an accident.  When he pulled that gun out, pointed it at law enforcement officers who were chasing him and yelling for him to stop, he is doing this on purpose.  It was his conscious objective to do so.  So it's not an accident in any way.  Three, he attempted to touch John Rogers.  Again, he didn't touch John Rogers in this case but he tried to.  *When he pulled the trigger on that gun and the bullet expelled from it, he was trying to touch him with that bullet.* . . .  Now, obviously, he had to have done this, this in a rude, insolent or angry manner. . . .  I think we can all agree from, again, our common experience and real world experience that shooting a gun at somebody is both rude and insolent.  The touching was committed by means of a deadly weapon. . . .  You will actually be given an instruction that just says that a loaded or unleaded firearm can be considered a deadly weapon.  In this case we know the firearm was loaded. . . .  I'm going to show you that he did attempt to shoot a 9mm firearm at Officer John Rogers.  *And again, he did shoot this 9mm firearm at John Rogers.  We know this through the testimony, through the muzzle flash, to the location of the weapon.  John Rogers said he saw the defendant drop that weapon, coming out of his hands as he went down from the TASER strike.  We know that the defendant shot this 9mm firearm, that you've seen State's exhibits there.  We know he shot at the defendant.*

*Transcript of Opening and Closing Argument* at 37-40 (emphasis supplied).

---

[9] Despite Duncan's request in his notice of appeal for a transcript of the complete trial and sentencing record, the opening statements and closing arguments in this case were not originally transcribed.  Accordingly, on October 21, 2014, this court issued an order requiring the court reporter to prepare and file with the trial court clerk a transcript of the opening and closing statements and instructing the trial court clerk to transmit the transcript to this court.  This court received the transcript on November 7, 2014.

To prove that Duncan committed pointing a firearm, the State was require to prove that he knowingly or intentionally pointed a firearm at another person. *See* I.C. § 35-37-4-3. Again, the charging information essentially recited the applicable statutory language, with the added specificity that the firearm was a 9mm Luger and that Sergeant Rogers the person at whom the firearm was pointed. The final jury instruction on this charge largely echoed the charging information. The State made the following argument in closing concerning the evidence on this charge:

> As he's running away from the police he pulls this gun out and points it over his shoulder. You don't get here by accident. He didn't have a spasm of some sort. He knew exactly what he was doing when he pulled that gun out and pointed it over his shoulder at the police officers that were pursuing. Pointed a firearm. He pointed a firearm. *How do we know? Once again, the muzzle flash. What did John Rogers testify to? The muzzle flash came right after. "I felt the concussion from the blast, and I felt something whiz past my head." That gun was pointed.* What did the other officers say? We saw the muzzle flash. It all went towards where John Rogers and Travis Yike were. What did we hear from Shane Strong? Muzzle flash in the direction of the police officers. And I even asked him "How do you know it wasn't in another direction?" He said, "Because I saw the muzzle flash go back towards the police officers." And what do we know about muzzle flashes? We heard from Melissa Oberg that a muzzle flash goes in the direction in which the gun is pointed typically. The barrel of the gun, when fired, a bullet is going to come out here followed by gases and fire, right out here. It's going to go in this direction, the direction in which the firearm is pointed. So we know that Christopher Duncan pointed this firearm and the last thing I need to prove is that he pointed it at Officer John Rogers. And, again, we know that because the muzzle flash went right towards John Rogers, the debris went towards John Rogers and he felt the concussion from the gun. He was that close when Christopher Duncan tried to shoot him. The State had proved each of these elements beyond a reasonable doubt and he is guilty of pointing a firearm.

*Id.* at 36-37 (emphasis supplied).

Although it is not necessary to prove that a firearm was actually discharged in order to support a conviction for pointing a firearm, in this case, the State invited the jury to rely on evidence that Duncan fired at Officer Rogers in order to find that Duncan had pointed the firearm. This is the very same evidence on which the State asked the jury to rely in order to convict Duncan of attempted battery with a deadly weapon. For this reason, we find that there is a reasonable possibility that the jury relied on the same evidentiary facts to establish the essential elements of both offenses, in violation of the actual evidence test. Accordingly, we remand with instructions to vacate Duncan's class D felony pointing a firearm conviction and the sentence imposed thereon.[10]

With respect to Duncan's resisting law enforcement conviction, we note that the charge was based on Duncan's flight from Officer Rogers, and it was elevated from a class A misdemeanor to a class D felony based on the allegation that Duncan "drew or used a deadly weapon" while fleeing. *Appellant's Appendix* at 88; *see* I.C. § 35-44-3-3 (providing that it is a class A misdemeanor to flee from a law enforcement officer after the officer has, by visible or audible means, identified himself or herself and ordered the person to stop, and that the crime is elevated to a class D felony if the person draws or uses a deadly weapon while committing the offense). On appeal, Duncan argues that his convictions for attempted battery by means of a deadly weapon and resisting law enforcement do not pass scrutiny under the actual-evidence test because there is a reasonable possibility that the jury relied on the same evidence—i.e., that Duncan fired a

---

[10] Because Duncan was ordered to serve his sentence on the pointing a firearm conviction concurrent with the attempted battery by means of a deadly weapon conviction, his aggregate sentence will not be affected.

gun at Officer Rogers—to support both the attempted battery by means of a deadly weapon conviction and the enhancement of the resisting law enforcement charge.

Even if we assume there is no double jeopardy violation under the actual-evidence test,[11] "[i]n addition to the instances covered by *Richardson*, 'we have long adhered to a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*.'" *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind. 2002) (quoting *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002)). One of these rules prohibits "[c]onviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished." *Id.* (quoting *Richardson v. State*, 717 N.E.2d at 56 (Sullivan, J., concurring)). Thus, if we determine that Duncan was convicted and punished for the enhancement of resisting law enforcement based on the same behavior or harm that forms the basis of his attempted battery by means of a deadly weapon conviction, a double jeopardy violation has occurred. *See Zieman v. State*, 990 N.E.2d 53, 61 (Ind. Ct. App. 2013) (reasoning that "if we determine that [Zieman] was convicted and punished for the enhancement of resisting

---

[11] In *Spivey v. State*, our Supreme Court explained that "under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." 761 N.E.2d 831, 833 (Ind. 2002). In this case, the resisting conviction required evidence of additional facts—i.e., Duncan's flight from Sergeant Rogers after Sergeant Rogers identified himself and ordered Duncan to stop—which are unrelated to the gun and unnecessary to support the attempted battery with a deadly weapon conviction. Thus, under a "strict reading" of *Spivey*, the convictions may not amount to a violation of the actual-evidence test or constitutional double jeopardy protections. *See Calvert v. State*, 930 N.E.2d 633, 642 (Ind. Ct. App. 2010); *but see Alexander v. State*, 772 N.E.2d 476, 478 (Ind. Ct. App. 2002) (finding a violation of the *Richardson* actual-evidence test "where the evidentiary fact(s) establishing one or more elements of one challenged offense establish all of the elements of the second challenged offense"), *trans. denied*.

law enforcement based on the same behavior or harm that forms the basis of his attempted murder conviction, then double jeopardy principles are violated"). In making this determination, we will apply the same "reasonable possibility" standard applicable under the actual-evidence test. *Id.* at 62.

The charging information for resisting law enforcement alleged that Duncan fled from Sergeant Rogers after Sergeant Rogers identified himself and ordered Duncan to stop, and while doing so, "drew or used a deadly weapon, to-wit: 9mm Luger[.]" *Appellant's Appendix* at 88. The final jury instruction on this charge was similar in substance. In closing argument, the prosecuting attorney made the following argument with respect to the evidence relating to the enhancement:

> However, in this case this is a Class D felony because the additional element I need to prove to you is that the defendant drew or used a deadly weapon while committing this offense. Ladies and gentlemen, the testimony was clear. The defendant, Christopher Duncan, after he was apprehended was wearing a belt around his mid-section, somewhere between his belly button and his nipple line. He was wearing basketball shorts. They don't have any belt loops in there, and you'll be able to see those basketball shorts. There's no belt loops so what was that belt being used for? If was being used to conceal this weapon on his person. . . . *The testimony that you heard is that everyone saw this weapon discharge over the defendant's left shoulder, the muzzle blast. Everyone is in agreement about the muzzle blast.* John Rogers talked about the muzzle blast. Travis Yike talked about the muzzle blast. Shane Strong talked about the muzzle blast. Nate Garrison talked about the muzzle blast. They all saw a muzzle blast come over the defendant's left shoulder. Now, [defense counsel] has made a production about the fact that nobody saw the gun coming up. And, again, now ask yourselves, do you leave, not to leave your real world experiences at the front door. You can see the pictures. It was dark outside. It was dark. There was very little street lights. That gun is black. Yes, it is going to be hard to see, but all the witnesses agreed that the muzzle flash when a trigger is pulled and a bullet is expelled, fire comes out of the barrel. All of the officers and Shane Strong, all the witnesses agreed, that they saw that coming from the defendant's shoulder area. We

21

know that he drew and used that firearm and thus is guilty of resisting law enforcement as a Class D felony.

*Transcript of Opening and Closing Argument* at 34-35 (emphasis supplied).

Based on this evidence, it is apparent to us that the prosecuting attorney invited the jury to rely on evidence that Duncan actually *fired* the gun while fleeing, as opposed to simply drawing or pointing the gun, to support the enhancement from a class A misdemeanor to a class D felony. This is the very same act that formed the basis of the attempted battery by means of a deadly weapon conviction. In light of the prosecuting attorney's argument, as well as the lack of specificity in the charging information and final jury instructions, we conclude that there is a reasonable possibility that the jury relied on the same evidence to support the attempted battery with a deadly weapon conviction and the enhancement of the resisting law enforcement conviction, resulting in a violation of double jeopardy principles.

We are therefore left to determine the proper remedy for the double jeopardy violation. This court has explained:

> When two convictions are found to contravene double jeopardy principles, a reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation. In the alternative, a reviewing court may vacate one of the convictions to eliminate a double jeopardy violation. In making that determination, we must be mindful of the penal consequences that the trial court found appropriate.

*Zieman v. State*, 990 N.E.2d at 64 (quoting *McCann v. State*, 854 N.E.2d 905,915 (Ind. Ct. App. 2006)). In this case, the double jeopardy violation is remedied by vacating the enhancement of Duncan's resisting law enforcement conviction based on drawing or

using a deadly weapon and reducing that conviction to a class A misdemeanor. We note that the trial court imposed the maximum three-year sentence on the class D felony resisting law enforcement conviction and ordered that sentence to be served consecutive to the maximum eight-year sentence for attempted battery by means of a deadly weapon, for a total sentence of eleven years on those two counts. The court went on, however, to state that the aggregate sentence for these offenses was subject to a statutory cap of ten years.[12] Although the trial court did not specify which sentence it was reducing to bring the sentence imposed within this ten-year cap, we note that it was clearly the trial court's intention to impose the maximum sentence available on both the attempted battery with a deadly weapon and resisting law enforcement conviction. We therefore remand with instructions to reduce Duncan's resisting law enforcement conviction to a class A misdemeanor and impose the maximum one-year sentence on that count, to be served consecutive to his eight-year sentence for attempted battery by means a deadly weapon. *See Zieman v. State*, 990 N.E.2d 53 (remanding with instructions to reduce a class C felony resisting law enforcement conviction to a class D felony and to impose a specific sentence). Duncan's consecutive three-year sentence for class D possession of marijuana remains undisturbed. Thus, Duncan's aggregate sentence will be reduced from thirteen years to twelve years.

Judgment affirmed in part, reversed in part, and remanded with instructions.

VAIDIK, C.J., and MAY, J., concur.

---

[12] The court also imposed a three-year sentence on the possession of marijuana conviction, to be served consecutive to the sentences for attempted battery by means of a deadly weapon and resisting law enforcement, resulting in a thirteen-year aggregate sentence.