Sharnee Robert APPLETON, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 45S00–9901–CR–00062.

Supreme Court of Indiana.

Jan. 8, 2001.

Charles E. Stewart, Jr., Crown Point, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, James B. Martin, Dep-uty Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

In appellant Sharnee Appleton's trial, one of the State's witnesses testified that Appleton had not even been present at the scene of the crime. The court permitted the prosecution to "impeach" this witness by reading line-by-line a prior inconsistent statement in which the witness described Appleton's participation. We hold this was error, but harmless in this case.

### Facts and Procedural History

The facts most favorable to the jury verdict revealed that on the evening of March 13, 1998, Ruby Haught, Ron Solberg, and others were visiting and smoking crack with Martha Fitts and John Williams (a.k.a. "Country Man") at their home in Gary. After Sharnee Appleton ("Pooh") and his two cohorts confronted Charmaine Blanchard ("Little Mama") outside, the attackers entered the home and continued their search for a snitch. Believing Solberg was a police informant, Appleton attacked Solberg and wrapped his head, ankles, and hands with duct tape.

The assailants struck Haught and Mary Cox (whose obnoxious behavior upon arrival at the home provoked her involvement). They wrapped these two with duct tape as they had Solberg. Then, the assailants escorted the three victims to Solberg's van. During the van ride, Solberg freed himself from the duct tape located a steel rod to use as a weapon, and attacked Appleton. Appleton fired his pistol wildly, wounding Solberg. Upon realizing that they were out of bullets, the abductors hastily ignited a fire in the van and fled. After extinguishing the fire on his clothing, Solberg discovered Haught dead and Cox severely injured.

Appleton's subsequent trial produced convictions on one count of murder, two counts of attempted murder, and three counts of confinement. The trial court

sentenced Appleton to a prison term totaling 110 years.

### I. Line by Line Recitation of Pretrial Statements

Before the trial, Blanchard and Williams gave statements implicating Appleton to the police. Nevertheless, the witnesses partially repudiated these statements while on the stand: Blanchard admitted that Appleton participated in some of the events and Williams denied that Appleton was present at the house during the incident.

During her examination of Blanchard and Williams, the prosecutor read the witnesses direct quotes from their pretrial statements and inquired about the accuracy of those particular declarations. Even though the trial court admonished the jury on multiple occasions not to treat this examination as substantive evidence, Appleton maintains that the court committed reversible error by allowing this type of questioning.

 A trial court possesses broad discretion in ruling on the admissibility of evidence. *Bacher v. State*, 686 N.E.2d 791 (Ind.1997). Moreover, even if a court errs in admitting evidence, we will not overturn the conviction if the error is harmless. Ind. Trial Rule 61; *Cooley v. State*, 682 N.E.2d 1277 (Ind.1997). An error will be viewed as harmless if the probable impact of the evidence upon the jury is sufficiently minor so as not to affect a party's substantial rights. *Fleener v. State*, 656 N.E.2d 1140 (Ind.1995).

Indiana courts have struggled a bit over how to treat out-of-court statements made by a witness before trial. A quarter century ago, this Court declared that prior out-of-court statements, even those not under oath, could be admitted as substantive evidence. *Patterson v. State*, 263 Ind. 55, 58, 324 N.E.2d 482, 484–85 (1975) (overruled, as discussed below). We soon recognized the problems inherent in this decision, however, and attempted to minimize some harmful side effects. *See Lewis v. State*, 440 N.E.2d 1125, 1130 (Ind.1982) *cert. denied*, 461 U.S. 915, 103 S.Ct. 1895, 77 L.Ed.2d 284 (1983) (courts should not permit "the State to put in substantive evidence of the witness-declarant's version of the facts solely through the admission of the witness' prior statement under the pretext of the *Patterson* rule"); *Samuels v. State*, 267 Ind. 676, 679, 372 N.E.2d 1186, 1187 (1978) (condemning unjustifiable extensions of *Patterson* and indicating that admission of out-of-court statements as substitute for available in-court testimony will no longer be permitted).

Eventually, we concluded that the additional requirements and limitations of the *Patterson* rule made it unworkable. We therefore overruled it. *See Modesitt v. State*, 578 N.E.2d 649, 652–54 (Ind.1991).

In *Modesitt*, we adhered to the Federal Rules of Evidence and limited the admission of a prior statement as substantive evidence to certain situations. *Id.* at 654; *see now* Ind. Evidence Rule 801(d). By permitting only those prior inconsistent statements made under oath to be considered substantive evidence, we hoped to impress upon a witness the "solemnity and importance" of his or her statements and remind the witness that being dishonest may result in a perjury indictment. *Modesitt*, 578 N.E.2d at 653. We also attempted to restrain the practice of calling numerous persons to testify about the same statement given by a particular witness, thereby preventing a "drumbeat repetition" of the witness's original story. *Id.*

 The goals of *Modesitt* and Rule 801(d) demonstrate why the trial court erred in permitting the State to directly examine the witnesses in this manner. Trials should principally proceed on the basis of testimony given in court, not statements or affidavits obtained before trial.[1]

---

1. Most of Blanchard's testimony indicating that Appleton participated in the events at the house was elicited by simple questions and answers rather than through line-by-line reci-

First, it is important to note that John Williams participated in the trial as a prosecution witness. During argument on Appleton's motion in limine, the defense questioned the State's motive for calling Williams. The State indicated that Williams would be put on the stand because he "talks about and substantiates things" to which the other witnesses testified. (R. at 519.) The prosecution also acknowledged its intention to impeach Williams. (*Id.*) While it was not barred from doing so just because Williams appeared as a State witness, Ind. Evidence Rule 607, a party is forbidden from placing a witness on the stand when the party's sole purpose in doing so is to present otherwise inadmissible evidence cloaked as impeachment. *See United States v. Ince*, 21 F.3d 576, 580–81 (4th Cir.1994); *United States v. Kane*, 944 F.2d 1406, 1411–12 (7th Cir.1991); *United States v. Gossett*, 877 F.2d 901, 907 (11th Cir.1989), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1141, 107 L.Ed.2d 1045 (1990); *Impson v. State*, 721 N.E.2d 1275, 1281 (Ind.Ct.App.2000).

Because Williams owned the home where the events began and observed the three assailants attack the victims, it is reasonable that the State wanted him to testify for purposes other than impeachment. Although one must wonder whether the State's goals were truly effectuated by Williams' testimony, we cannot definitively declare that the State placed Williams on the stand for the sole purpose of impeaching him.

Nevertheless, the State's method of impeaching Williams left much to be desired. Under our rules, a party may impeach a witness by extrinsic evidence of a prior inconsistent statement. Ind. Evidence Rule 613(b). However, "once a witness has admitted an inconsistent prior statement she has impeached herself and further evidence is unnecessary for impeach-

ment purposes." *Pruitt v. State*, 622 N.E.2d 469, 473 (Ind.1993).

In *Pruitt*, one of the witnesses had given an audiotaped statement to Indiana State Police detectives. At trial, however, the witness recanted her prior statement and insisted that she lied when talking to the police. When the State initially asked the court for permission to play the tape for the jury, the trial court refused because the witness had already recanted her prior statement. *Id.* at 472–73. Nonetheless, as her examination progressed, the witness claimed that she had been submitted to police duress; therefore, the court ultimately allowed the jury to hear her pretrial taped statement for the limited purpose of demonstrating that she had not been subjected to duress. *Id.* at 473. Although we determined that the court justifiably permitted the State to present evidence that the witness was not subjected to police duress, we also held that the court properly prohibited the State's initial request to present the taped statement for impeachment purposes because the witness had already admitted an inconsistent statement. *Id.*

The attempted impeachment of Williams in this case bears resemblance to the impeachment of the witness in *Pruitt*. By reciting excerpts of Williams' pretrial statement and asking Williams if he made these declarations, the State might as well have played an audiotaped version of Williams' statement to the jury. The trial court judge was wary of this method of questioning, as indicated by his statement that "it's the old story, you don't want the prosecutor to just go sentence by sentence through a statement and read the whole statement...." (R. at 553.) Nevertheless, the court permitted this style of questions by the State even after Williams testified that Appleton was not present when the three assailants came to the house. (R. at 549.)

tation of her pretrial statement. (R. at 459–93.) Accordingly, we will focus primarily on

the State's examination of Williams.

Once Williams denied Appleton's involvement in the events, the State should have made Williams aware of specific portions of his testimony that were inconsistent with statements he made prior to trial and given him an opportunity to explain those inconsistencies. Only one glaring inconsistency existed, however, between Williams' testimony and the portions of Williams' pretrial statement that the State recited. Williams previously implicated Appleton as a participant and then at trial said Appleton was not involved. (R. at 532–60.) When questioning Williams about this inconsistency, the prosecutor's impeachment inquiry should have concluded when Williams responded that he remembered making the statement but it was not true because Appleton was not present during the incident. (R. at 554.)

Six pages of the record are consumed with the State reciting portions of Williams' pretrial statement, the State asking Williams whether he remembers making the statement, and Williams responding that either he did not remember making the statement or he lied because "Pooh" was not present. (R. at 554–59.) We find it difficult to understand that a legitimate impeachment purpose was served by the this method of questioning.

Once Williams admitted that he made a police statement prior to trial that was inconsistent with his testimony regarding Appleton's involvement in the incident, impeachment was complete. Williams had admitted himself a liar. Reciting segments of Williams' pretrial statement was thus superfluous. *See United States v. Soundingsides,* 820 F.2d 1232, 1240–41 (10th Cir.1987) (no rational basis for introducing prior inconsistent statement where witness does not deny making the inconsistent statement). The only purpose such recitation could have would be to get the details of Williams' former statement before the jury as substantive evidence, the very thing we decided to prohibit in overruling *Patterson.*

As we indicated above, the State also improperly questioned Blanchard during certain portions of its direct examination of her. We give less treatment to the State's questioning of Blanchard, because almost all of her incriminating statements of Appleton were made during appropriate examination. Furthermore, some reference to Blanchard's pretrial statement was warranted. For example, Blanchard testified that she was unsure whether Appleton and the two other assailants duct taped anybody. (R. at 475.) In her prior statement to the police, however, she said the attackers wrapped Solberg's hands, feet and head with duct tape. (R. at 487–88.) After being made aware of the statement, she recalled that the attackers had in fact taped Solberg. (*Id.*)

On the other hand, nearly six pages of the record are consumed by the State reading line-by-line excerpts from Blanchard's pretrial statement. A couple of examples follow:

Q: Now do you ever recall telling the Gary Police Department, the detectives, about, "They kept messing with Ron. Then they pushed Ruby by me and went back to messing with Ron. 'I got you now. I got you now.'"

. . . .

Q: Do you remember telling the Gary Police Officers, "Then Pooh was asking Mary who she was, but she wouldn't answer him. Ruby was laying on the floor, blood was coming out her mouth and nose, and she was twitching"?

(R. at 487–89.) These statements covered topics not addressed in Blanchard's trial testimony. They were therefore not inconsistent with Blanchard's testimony, and it was inappropriate for the prosecution to recite them.

Despite Williams' denial of Appleton's presence at the crime scene and Blanchard's denial that Appleton participated in certain events, their testimony was substantially similar to Solberg's. (R. at 331–40, 465–75, 538–43.) Thus, even

though the jury heard evidence they should not have during the State's line-by-line recitation of the witnesses' pretrial statements, essentially the same evidence was properly before the jury through Solberg's testimony. As we indicated previously, the error in admission of evidence will typically be harmless "where the hearsay evidence is merely cumulative of other evidence properly admitted." *Cooley*, 682 N.E.2d at 1282. While the error was harmless in this instance, it might lead to reversal under different facts.

## II. Sufficiency of the Evidence

■ To address Appleton's sufficiency claim, we recite the facts in greater detail than we did above. On the evening of March 13, 1998, Haught, Solberg, and others were gathered at the home of Fitts and Williams to smoke crack. As Blanchard arrived, Appleton and two other men, who had just pulled up together in front of the house, accosted Blanchard about "talking to the police." (R. at 330–31, 465.) While Appleton vocally confronted Blanchard, the other two men physically attacked her from behind. The men hit and kicked Blanchard until Appleton removed them and commanded them to cease.

Following the altercation, the two assailants and Appleton, who pulled Blanchard up the stairs by her hair, entered the house. After an initial dispute with Ruby Haught, Appleton, relying upon Blanchard's assertion, accused Ron Solberg of being a police informant. Despite Solberg's denial, Appleton stripped, searched and struck him. Then, Appleton wrapped Solberg's head, ankles and hands with duct tape and the men struck Solberg twice in the head and once in the ribs with an unidentified object.

As Haught arose from her position on the couch, one of the men attempted to hit her with a stick. Appleton blocked the attack, directed his accomplice not to hit Haught, and proceeded to strike Haught himself. At about this time, Mary Ann Cox came to the house to purchase some crack and encountered the assailants beating up Haught. Cox had been drinking and she became embroiled in the conflict because of her inability to cooperate with the attackers.

Appleton instructed the other two men to duct tape Haught and Cox in the same fashion that he had secured Solberg. The men struck Cox and unrelentingly beat Haught after the women were wrapped with duct tape. The assailants eventually led the victims outside and placed them in Solberg's van, which was parked in front of the house. Before departing with the victims, one of the men warned Williams and Blanchard that if "anybody told anything" about what had happened, then they would be killed. (R. at 474–75.)

Because Appleton had already told Solberg that he was going to be killed (R. at 339), Solberg used the time while being transported in his van to develop a survival plan. The men had positioned Solberg out of their sight in the back of the van; therefore, he was able to free himself from the duct tape unnoticed by his abductors. Solberg located a steel walking stick that he intended to use to attack the men.

When the van stopped, Solberg delivered a blow with the stick that knocked Appleton (who was sitting in the seat in front of Solberg) on his back. In response to this surprise attack, Appleton wildly fired his small automatic pistol wounding Solberg with two bullets, one in his upper right arm and one in his back. Appleton then put the gun to the back of Solberg's head and pulled the trigger; however, the gun clicked and nothing happened.

The assailants realized that they were out of bullets, so they doused Solberg and the van with gasoline and ignited a fire. Solberg successfully extinguished the fire on his body by rolling on a quilt that he found in the back of his van. The van fire persisted, so as soon as he heard emergency vehicle sirens, Solberg exited the vehicle.

Alighting from the van, he discovered that his abductors had apparently rolled up a piece of paper, lit it, and stuffed it in the gas tank. Solberg threw the paper in the wet snow and checked on the other victims, Cox and Haught, who were laying in the front of the van. Cox had two bullets in her head, which caused her to lose her right eye and three-quarters of the vision in her left eye. Haught died from a gunshot wound to her head and two more to her torso.

The next day, the police visited Solberg and Cox in the hospital to determine whether the victims could recognize any of the assailants in a photo lineup. Cox's injuries prevented her from seeing the pictures. Solberg, however, made a possible identification that Appleton was one of his abductors. During trial, Solberg positively identified Appleton as one of the individuals who participated in the crimes.

We consider Appleton's sufficiency claims through the prism of our standard of review. This Court does not resolve conflicts in the evidence or judge the credibility of the witnesses. *See Fielden v. State*, 437 N.E.2d 986 (Ind.1982). We view the evidence most favorable to the verdict and will affirm the trial court's verdict if the probative evidence and the reasonable inferences drawn therefrom could have permitted a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *See Glover v. State*, 253 Ind. 536, 255 N.E.2d 657 (1970).

Appleton's claim focuses on the reliability of the State's witnesses. (Appellant's Br. at 13–14.) He claims that the State's evidence lacks probative value, because only Solberg testified that Appleton was one of the assailants and the State's witnesses were under the influence of drugs the night the events transpired.

Appleton's assertion that Solberg was the only witness to testify that Appleton was one of his attackers is tenuous. Disregarding any testimony by Blanchard and Williams that was elicited by inappropriate line-by-line examination, Solberg, Blanchard, and Williams all testified consistently concerning how the events began. (R. at 330–36, 462–67, 538–41.) Although Williams denied that Appleton was involved in the crimes, Blanchard admitted that Appleton was a participant in the attack upon Cox, Haught, and Solberg. In fact, Blanchard's testimony that Appleton directed the other attackers to stop hitting her and prevented one attacker from beating up Haught substantially corroborated Solberg's testimony that Appleton was the leader. (R. at 338–39, 465, 470.) Thus, it was reasonable for the jury to consider testimony by Solberg and Blanchard corroborating Appleton's participation in the events.

In addition to Blanchard's appropriate testimony, Solberg identified Appleton in two separate photo arrays. As he testified in court, Solberg qualified these as possible identifications because although the "face looked right . . . the body size looked different." (R. at 378, 425–27.) Solberg explained that a heavy coat Appleton wore the night of the crimes caused this discrepancy. Solberg also unquestionably identified Appleton as his attacker at trial, stating "I recognize his face; I was standing three feet from him." (R. at 428.) Solberg's testimony alone would be sufficient to prove that Appleton perpetrated these crimes.

Furthermore, assessing the impact of drug use on the witnesses' capacity to observe and testify is the jury's job, not ours. We refrain from encroaching upon the jury's duty to evaluate the credibility of the witnesses unless the witness offers inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Lott v. State*, 690 N.E.2d 204 (Ind.1997). That a witness might be impaired at the time of the crime should not cast such a shadow on his or her testimony as to render it incredibly dubious.

The jury apparently concluded that Solberg's actions demonstrated his clear-

headedness. After all, even if Solberg was impaired at the time of the incident, he was evidently lucid enough to drive an automobile, craft a survival plan, battle with his assailants, extinguish a bodily fire, and prevent the van from being incinerated. The events described by Solberg were not inherently improbable, nor do they operate counter to natural laws or human experience. *Thacker v. State*, 556 N.E.2d 1315 (Ind.1990).

Juries are expected to resolve conflicts in the testimony of various witnesses, and a jury could certainly have determined that the evidence was sufficient to find Appleton guilty of the crimes beyond a reasonable doubt.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.