## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 19 2015, 9:10 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Lawrence M. Hansen<br>Hansen Law Firm, LLC<br>Noblesville, Indiana | Gregory Zoeller<br>Attorney General of Indiana<br><br>Katherine Modesitt Cooper<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Aaron Harlow,<br><br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br><br>*Appellee-Plaintiff* | June 19, 2015<br><br>Court of Appeals Case No. 29A02-1412-CR-829<br><br>Appeal from the Hamilton Superior Court<br>The Honorable Daniel J. Pfleging, Judge<br>Cause No. 29D02-1401-FB-404 |

**Bradford, Judge.**

# Case Summary

[1]    In late 2013 and early 2014, there were multiple reports of home invasions and burglaries in Hamilton County. Appellant-Defendant Aaron Harlow was

convicted of one count of burglary and three counts of theft relating to these break-ins. Thereafter, Harlow stipulated to being a habitual offender and received an aggregate fifty-six year executed sentence.

[2] Harlow's wife, Amy Price, committed the crimes with Harlow and was tried and convicted in a separate proceeding. After initially admitting to police that she and Harlow committed the crimes together, Price later recanted her statement and testified that Harlow was not with her when she committed the burglaries. On appeal, Harlow argues that the trial court erred in admitting certain evidence including recordings of phone calls made by Harlow from jail, a recording of a conversation between Harlow and police, and allowing Appellee-Plaintiff the State of Indiana ("the State") to impeach Price regarding her initial statement to police. Harlow also argues that there is insufficient evidence to sustain his convictions because there is no direct evidence placing him at any of the burglarized houses during the commission of the crimes. We affirm Harlow's convictions.

## Facts and Procedural History

[3] On December 24, 2013, Laura Johnson's home was burglarized and several items were stolen, including a laptop computer, two televisions, $200.00 in cash, a camera, and jewelry. (Tr. 296-7) Two days later, on December 26, Harlow, accompanied by Price, pawned the stolen camera and several pieces of jewelry at an Indianapolis-area pawn shop. (State's Ex. 63, tr. 489)

[4] On January 13, 2014, Roxanna Mullins returned home to find that the back sliding glass door to her house had been smashed with a propane tank and several items had been stolen from inside, including two televisions, a gun, a purse, and sleeping medication. (Tr. 332, 335-36) Later that day, Price, accompanied by Harlow, pawned the same two televisions stolen from the Mullins residence. (State's ex. 64, tr. 489)

[5] On January 14, 2014, James Lipps returned home to find that a glass panel on his front door had been removed. (Tr. 376) Upon entering his house, Lipps heard a noise from a back room and saw a man run out the back door. (Tr. 377) Lipps did not get a clear enough view to identify the intruder other than describing him as being a man of medium height and build. (Tr. 377, 396) Items stolen from Lipps's home include a pocket watch and chain, two wristwatches, a camera, $300.00 in cash, and several pieces of jewelry. (Tr. 379, 401) On January 15, 2014, Price and Harlow were arrested at a gas station. (Tr. 480) After searching the white Chevy Malibu the two had been driving, police found a purse belonging to Price which contained jewelry stolen from the Lipps residence. (Tr. 487-88) Police also found a pair of gloves in the car. (Tr. 696) The crime scene technician Melissa Roberts testified that the "beading" or "knobbiness" on the gloves matched that of glove impressions found on the sliding glass backdoor of the Mullins residence and on a filing cabinet and dresser in the Lipps residence. Tr. p. 697.

[6] Following their arrest, Price gave a statement to police admitting that she participated in the burglaries and identifying Harlow as her accomplice. (Tr.

481-82) Price also told police that Harlow had placed the jewelry stolen from the Lipps residence in her purse. (Tr. 488) On January 15, 2014, the State charged Harlow with five counts of burglary and four counts of theft. (App. 76-8)

On June 2, 2014, Roberts, accompanied by Detective Michael Rees, took DNA samples from Harlow via oral swabs. (tr. 707) While obtaining the samples, Harlow initiated a conversation with Detective Rees. At trial, the State introduced a recording of this exchange, over Harlow's objection, which was played for the jury.

> Harlow: How have you been doing, Mr. Rees?
> Rees: I'm all right. You look a lot better.
> Roberts: Uh-huh.
> Rees: You look healthier.
> Roberts: You look clean.
> Harlow: I'm not too bad. I just feel horrible for my wife.
>
> * * *
>
> Harlow: Things got kind of crazy…I was alive to see, you know, the heroin epidemic. It's sad.
> Rees: It's bad.
> Harlow: And I'll be honest with you. When I grew up, I grew up in Cicero, so I went to high school, we drank beer, smoked pot…Never thought I would shoot dope or anything like that…And the heroin started. One day I was watching the game, and me and another person, and he was like, "Smoke this bong," and I was already drunk and I said, "Why not?" You know, and just–
> Rees: That's all it takes, you know.
> Roberts: We use that as education for others because there are a lot of people that are still doing stupid stuff, burglarizing, and doing everything else just to get their dope, and that's dumb, you know. They're going to end up right where you're at….
> Rees: We deal with this a lot, and the last gal that I popped, the same

thing that you were doing…She got out and she just…got arrested again…

Harlow: What would – I don't know how I'd go about that, but, like, a clean-up. Would that help?

Rees: Clean-up?

Harlow: Clean-up some things.

Rees: I mean, I can't tell you.

Harlow: Yeah.

Rees: That's completely onto you. If you think you've got information that's going to help, contact your–

Harlow: (indiscernible – talk over) somebody told me to ask for a clean-up statement, whatever that means.

Rees: Yeah. You can – what you need to do is–

Harlow: What, you would talk to the prosecutor and–

Rees: And, we can't promise you nothing. It depends on what information you've got and what cases it clears. All right. And then it's up the prosecutor.

Harlow: Okay, well, I'm going – I'm going to contact my attorney this week.

Rees: Let him know what you want to do and then send a request over to us.

* * *

Harlow: I think it can help a lot.

Rees: Whatever you think, you know, like I said I can't tell you what to do but whatever's going to help you do what you need to do.

Harlow: I really want to help my wife more than anything, but I don't know if it's too late or what, you know.

* * *

Harlow: I mean, I would have pled guilty to everything, even stuff I didn't do if they – if it would have helped her.

Rees: Yeah.

Harlow: You know what I mean?

Rees: You've got to do what's right for you and, you know, take the advice of your attorney. So, and if he's got questions, he can call me, too.

Tr. pp. 711-18.

[8] While in jail, Harlow made the following statements during recorded phone calls: "My wife's in jail with me right now. We – yeah – we did – we did some Bonnie and Clyde s[***], right?," tr. p. 743; and, "You know, I'm a firm believer in, you know, you make your bed, you lie in it, right?…As I told my wife, … I was like, 'Look, babe, there's – there's going to come a time we're going to jail, right? That's part of it, you know.'" Tr. pp. 744-45. When asked, "Aaron, why – why did you guys – why? Why? Why? Why? Why? That's just the biggest question is why?," Harlow responded, "Yeah. Just being – just being stupid, you know. I had a couple (indiscernible) set up and just – I don't even want to talk about it over the phone." Tr. pp. 745-46. Harlow then mentioned that he felt betrayed by Price and that she was "trying to get me to spend the rest of my life in prison…[f]or me doing something that [she] wanted me to do?...I can't tell you on the phone right now, but this wasn't my idea…I was actually against any of this." Tr. pp. 746-47. Despite Harlow's objection, the trial court allowed the State to play portions of the recorded phone calls to the jury.

[9] Prior to Harlow's jury trial, Price recanted on her initial statements to police implicating Harlow and testified instead that Harlow was not involved in or present during the burglaries and did not put items stolen from the Lipps residence in her purse. (Tr. 431, 434, 442) Harlow filed a motion in limine seeking to prohibit the State from impeaching Price using her prior inconsistent statements to police that she and Harlow had committed the burglaries together. (Tr. 481) After a hearing conducted outside the presence of the jury,

the trial court denied Harlow's motion in limine, allowed Price to testify, and instructed the jury that Price's impeachment could only be considered in reference to her credibility and not as substantive evidence against Harlow. (Tr. 441-49) Price testified that she committed all of the burglaries for which Harlow was charged, that she acted as the getaway driver and lookout while her accomplice entered the homes and stole property, that she committed all of the burglaries with the same man, and that she borrowed a white Chevy Malibu from a friend which she used during each burglary. The following exchange occurred when the State attempted to impeach Price based on her initial statements to police.

> State: I would like to turn your attention to January 14, 2014. Were you at 19225 Edgewood Lane on that day?
> Price: Would you please say the last name? I'm not sure that --
> State: The Lipps' residence.
> Price: Yes.
> State: Did you drive there with the intent to be a part of a burglary of that residence?
> Price: Yes.
> State: And, who were you there with?
> Price: I can't say right now.
> State: Was it the Defendant?
> Price: No.
> State: Who was it?
> Price: I'm not--
> State: Why can't you say?
> Price: I just can't right now. It's for my safety reasons, and I'm not implicating anyone right now.
> [Bench Conference]
> State: Was it the same person at all of these residences that you were with?
> Price: Yes.
> State: And, did you know that person?

Price: Yes.

State: Do you know that person's name?

Price: Yes.

State: All right. What's the name?

Price: Chris.

State: Chris?

Price: I do not know his last name.

State: Were you arrested on January 15, 2014?

Price: Yes.

State: And, when you were arrested were you at a gas station?

Price: Yes.

State: In the same car you'd been driving at all the previous times discussed?

Price: Yes.

State: The white Malibu?

Price: Yes.

State: And was the Defendant in the car with you, or had he been in the car with you?

Price: He had been in the car with me.

State: When you were at the gas station, he'd actually gotten out of the car when you were actually – when you were both arrested. Is that correct?

Price: Yes. I believe he was inside.

State: All right. And then you were brought back to the Hamilton County Sheriff's Department?

Price: Yes.

State: And, you were interviewed by detectives?

Price: Yes.

State: All right. And, did the detectives ask you about burglaries?

Price: Yes, they did.

State: And, did you at first deny it?

Price: Yes.

State: And then, did you eventually admit to them that you had committed burglaries?

Price: Yes.

State: And, did you tell them who was with you during those burglaries?

[Defense counsel objects]

Questions by the Court:

Court: Ms. Price, when you were interviewed, did the detectives ask you who you were with?

Price: I can't remember that.

Court: Did you tell them that you were with somebody?

Price: Yes.

Court: And the somebody that you told them that you were with it would – would that be inconsistent with the testimony that you have just given the Court?

Price: Yes, sir.

Court: Ladies and gentlemen of the jury, I am going to overrule Mr. Hansen's objection. I'm going to allow the State to ask the question, but I need to inform you that this is what we call a prior inconsistent statement. The credibility of a witness may be attacked by introducing evidence that at some former occasion the witness made a statement inconsistent with her testimony in this case. Evidence of this kind may be considered by you in deciding the value of the testimony of the witness. This inconsistent statement is admitted solely for impeachment purposes and cannot be used as substantive evidence against the defendant. You may ask your question.

State: Who did -- on January 15th of this year when you gave your statement to law to the detectives, who did you tell them committed burglaries with you?

Price: Aaron Harlow.

Tr. pp. 476-483. Price went on to explain the general practice by which her and her accomplice conducted the burglaries as well as testifying that Harlow was with her each time she pawned the stolen items. (tr. 489)

[10] Following the State's presentation of evidence, the trial court granted Harlow's motion for judgment on the evidence with regards to one charge of burglary and one charge of theft regarding a single victim's house. The jury found Harlow not guilty on all but one of the burglary charges and guilty on the remaining three theft charges. Harlow then stipulated that he was a habitual offender. (Tr. 857-69) The trial court sentenced Harlow to twenty years

executed for the burglary conviction, which was enhanced by an additional thirty years as a result of Harlow's status as a habitual offender, and three years executed for each theft conviction, one of which to be served concurrently, for an aggregate term of fifty-six years executed. (App. 11-12)

# Discussion and Decision

Harlow now argues that the trial court erred in admitting the recorded conversation between him and Detective Rees, admitting the phone calls Harlow made from jail, and allowing the State to impeach Price using her initial statements to police. Harlow also argues that there is insufficient evidence to sustain his conviction and asks this court to reduce his sentence pursuant to Appellate Rule 7(B).

# I. Admission of Evidence

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court." *Payne v. State*, 854 N.E.2d 7, 13 (Ind. Ct. App. 2006) (citations omitted). We will not reweigh evidence and consider conflicting evidence most favorable to the trial court's ruling. *Gray v. State*, 982 N.E.2d 434, 437 (Ind. Ct. App. 2013).

Indiana Trial Rule 401 provides that "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Indiana

Trial Rule 403 provides that "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

## A. Price Impeachment

During trial, Harlow argued that Price's testimony would be irrelevant and highly prejudicial to him because Price's statements implicating him had been recanted. Harlow alleged that the only reason the State intended to question Price was to introduce otherwise inadmissible evidence under the guise of impeachment. (Tr. 442) The State responded that it did not intend to call Price for the sole purpose of impeachment, arguing that because Price admitted to and was previously convicted of committing the burglaries, she could provide relevant testimony concerning the details and circumstances of the crimes as well as her relationship with Harlow. (Tr. 443-44)

Any party has the right to impeach its own witness. *See* Ind. Evidence Rule 607. However, a party is not permitted to call a witness for the sole purpose of introducing otherwise inadmissible evidence under the guise of impeachment. *Herron v. State*, 10 N.E.3d 552, 556 (Ind. Ct. App. 2014) (citing *Appleton v. State*, 740 N.E.2d 122, 124 (Ind. 2001); *see also Griffin v. State*, 754 N.E.2d 899, 904 (Ind. 2001) ("[T]he rule allowing a party to impeach his own witness may not be used as an artifice by which inadmissible matter may be revealed to the jury through the device of offering a witness whose testimony is or should be known to be adverse in order, under the name of impeachment, to get before the jury a

favorable extrajudicial statement previously made by the prior witness."), *aff'd on reh'g*, 763 N.E.2d 450 (Ind. 2002), (citation omitted)).  We must therefore determine whether calling Price as a witness served any legitimate non-impeachment purpose.

[16]     Harlow argues that the State's impeachment of Price is analogous to the situation presented in *Herron* where this court determined that the State impermissibly impeached a witness.  In *Herron*, the State sought to impeach defendant's girlfriend, Tebo, who had implicated defendant in a burglary before ultimately recanting her statement.

> Our Courts have declined to find that a witness was called for the sole purpose of impeachment where the witness observed the underlying crime and provided, on the stand, other relevant testimony. *See Appleton*, 740 N.E.2d at 125 (impeached witness owned the home where the events at issue began and observed the attack on the victims); *Edmond v. State*, 790 N.E.2d 141, 146 (Ind. Ct. App. 2003) (witness was present at the scene of the crime and gave a first-hand account of the event), *trans. denied*, *Kendall v. State*, 790 N.E.2d 122, 127 (Ind. Ct. App. 2003) (impeached witness saw shooting that gave rise to trial for attempted murder), *trans. denied*.  But Tebo did not witness the burglary of the Beever home.  And we are not persuaded by the State's argument that Tebo's testimony was needed to corroborate Marshal Flahive's testimony that he spoke to her and that the interview provided the information necessary for a search warrant. Appellee's Br. p. 7.  This is course-of-investigation evidence, which we have recognized as generally irrelevant in that it does not make it more or less probable that the defendant committed the crime alleged. *Kindred v. State*, 973 N.E.2d 1245, 1255 (Ind. Ct. App. 2012), *trans. denied*.
>
> Put simply, the record belies the State's argument that Tebo's testimony served a legitimate non-impeachment purpose. The State knew before trial that Tebo's testimony would be inconsistent with her pretrial statement.  Tebo's direct examination spans thirty-five pages,

thirty of which pertain to her pretrial statement, and the remaining pages do not contain substantive testimony. These facts, when considered in light of the minimal evidence tying Herron to the burglary, lead us to conclude that the State's only purpose in calling Tebo as a witness was, in fact, impeachment. See *Griffin*, 754 N.E.2d at 904-05 (defense witness called solely for impeachment where he did not witness any of the relevant events, did not provide any substantive testimony, and the defense's actions indicated a singular intent to impeach).

Herron also argues that the State's method of impeachment was improper. We agree. Tebo readily admitted that her testimony was inconsistent with her pretrial statement. Despite admitting herself a liar, the State drove the point home by reading, line-by-line, from her pretrial statement. *Supra* pp. 554-56. This was improper and unnecessary.

*Herron*, 10 N.E.3d at 556-57.

[17] In contrast to the witness in *Herron*, Price was a firsthand witness to the crime, and, moreover, a fellow perpetrator. Price testified about the details of how each burglary was carried out, that she committed all of the burglaries with the same accomplice, what her and her accomplice's roles were in each crime, and she identified the automobile which was used in the commission of the crimes. She went on to testify that Harlow was with her each time she pawned the stolen items and that Harlow personally pawned some of the stolen items. These facts were relevant by providing the jury with a first-hand account of the crimes and by tying Harlow directly to the stolen goods.

[18] Furthermore, in *Herron*, the prosecutor impeached Tebo by "reading, line-by-line, from her pretrial statement." *Id*. In the instant case, the prosecutor only twice asked Price impeachment directed questions; one regarding who she had

initially told police was her accomplice in the burglaries and another regarding whether she had initially told police that Harlow put the stolen items in her purse prior to their arrest. (Tr. 483, 488)

[19] As we stated in *Herron*, "[o]ur Courts have declined to find that a witness was called for the sole purpose of impeachment where the witness observed the underlying crime and provided, on the stand, other relevant testimony." *Id*. Because Price was a firsthand witness to the crime and provided other relevant testimony, we cannot agree with Harlow that the trial court erred by allowing the State to impeach Price.

## B. Detective Rees Conversation

[20] Harlow claims the trial court erred by allowing into evidence the recording of the conversation between Harlow and Detective Rees taken during the collection of DNA from Harlow. Harlow argues that his statements were made incident to plea bargaining and so were not admissible. The Indiana Supreme Court has held that once plea negotiations have begun, statements made by the defendant are privileged and inadmissible at trial. *Martin v. State*, 537 N.E.2d 491, 493 (Ind. 1989). "[T]o qualify as a privileged communication, a statement must meet two requirements: first, the defendant must have been charged with a crime at the time of the statement, and, second, the statement must have been made to someone with authority to enter into a binding plea bargain." *Id*.

[21] Certainly, Harlow had been charged with a crime at the time he made the statements in question. However, Detective Rees did not have authority to

make a binding plea agreement or negotiate on behalf of the prosecutor. *See id*. Furthermore, Detective Rees made it abundantly clear to Harlow that he did not have such authority and that Harlow should contact his attorney who could then contact the prosecutor about a possible plea deal.

> Harlow: What, you would talk to the prosecutor and–
> Rees: And, we can't promise you nothing. It depends on what information you've got and what cases it clears. All right. And then it's up the prosecutor.
> Harlow: Okay, well, I'm going – I'm going to contact my attorney this week.
> Rees: Let him know what you want to do and then send a request over to us.

Tr. pp. 715-16. It is apparent that the statements made by Harlow were freely volunteered. As such, the trial court did not err in admitting Harlow's statements to Detective Rees.

[22] Even assuming that the trial court erred by admitting the conversation, any such error was harmless. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Crawford v. State*, 770 N.E.2d 775, 779 (Ind. 2002) (quoting *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995); Ind. Trial Rule 61). "In determining whether error in the introduction of evidence affected the defendant's substantial rights, this Court must assess the probable impact of the evidence upon the jury." *VanPatten v. State*, 986 N.E.2d 255, 267 (Ind. 2013). "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt sufficient to satisfy the reviewing court that there is no substantial likelihood that the questioned

evidence contributed to the conviction." *Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004) (citing *Hernandez v. State*, 785 N.E.2d 294, 300 (Ind. Ct. App. 2003), *trans. denied*.).

[23] The relevant portion of the conversation between Harlow and Rees came when Harlow made a tacit admission to some wrongdoing. Harlow stated, "I would have pled guilty to everything, even stuff I didn't do if they – if it would have helped [Price]." Although the admission is relevant as it tends to indicate Harlow's guilt, it does not provide any specificity as to what crimes he is referring to other than a slight indication that it involved a crime committed with Price. Furthermore, the probative value of the admission is relatively insubstantial when compared to the other evidence against Harlow, particularly the much more specific and incriminating admissions made during Harlow's phone calls from jail. As such, we find that any error committed by the trial court in admitting the recorded conversation between Harlow and Rees was harmless.

## C. Jail Phone Calls

[24] Harlow claims that the trial court erred in admitting the recorded jail phone calls because they were not relevant. He argues that his tacit admissions of wrongdoing made during the calls did not specify what crimes he may have committed and that "it requires the listener to speculate whether Harlow is speaking of the [] incidents for which he is being prosecuted." Appellant's Br. p. 20.

Contrary to his claims, Harlow's statements did indicate that he was referring to the crimes at issue in this case. Harlow stated that he and Price "did some Bonnie and Clyde s[***]," that he told Price that "there's going to come a time we're going to jail." Tr. pp. 743, 745. He also stated that he felt Price had "betrayed" him, that she "was trying to get me to spend the rest of my life in prison," and finally that "those charges, they have no evidence on nothing. It was all of her statement." Tr. pp. 746, 747. It is reasonable to infer that these remarks refer to the couple's joint commission of the burglaries and to Price's initial statement to police implicating Harlow in the crimes. Accordingly, these statements are clearly relevant as they tend to show Harlow's guilt. Harlow argued that these statements did not necessarily refer to the burglaries at issue and instead could have referred to some other crimes committed by the couple. (Tr. 589) However, such an argument goes to the weight to be afforded the evidence, not its admissibility, and it is not the place of this court to reweigh evidence. *Gray*, 982 N.E.2d at 437.

## II. Sufficiency of Evidence

Harlow claims that the evidence is insufficient to support his convictions. In reviewing a challenge to the sufficiency of evidence, this court does not reweigh evidence or re-assess the credibility of witnesses, and considers conflicting evidence in a light most favorable to the trial court's decision. *Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007); *Vitek v. State*, 750 N.E.2d 346, 352 (Ind. 2001). "We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom." *Vitek*, 750 N.E.2d at 352. Evidence is sufficient if

an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). "Evidence is insufficient to convict when no rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *Matthews v. State*, 718 N.E.-2d 807, 810-11 (Ind. Ct. App. 1999) (citing *Cuto v. State*, 709 N.E.2d 356, 362 (Ind. Ct. App. 1999)). "A verdict may be sustained based upon circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt." *Houston v. State*, 730 N.E.2d 1247, 1248 (Ind. 2000) (string citation omitted).

[27] In order to prove that Harlow committed Class B felony burglary, the State was required to prove that Harlow broke and entered Mullins's home with the intent to commit a felony therein. Ind. Code § 35-43-2-1. To sustain the convictions for Class D felony theft, the State was required to show that Harlow knowingly exerted unauthorized control over the three victims' property with the intent to deprive the victims of any part of the property's value or use. Ind. Code § 35-43-4-2(a).

[28] Harlow argues that there was insufficient evidence to support his convictions because there was no direct evidence placing him at the burglarized homes. Harlow argues that this is analogous to the case of *Kidd v. State* in which the Indiana Supreme Court found that a person may not be convicted of burglary *solely* on the basis of having been found in possession of burgled items; although, such evidence does support an inference of guilt of burglary and theft of that property. 530 N.E.2d 287, 288 (Ind. 1988). In *Kidd*, the *only* evidence supporting Kidd's conviction for burglary was that he sold the stolen items two

to four days after the burglary took place. *Id.* The Court held that such evidence alone was insufficient to support the conviction. *Id.*

[29] In contrast to *Kidd*, there is substantial additional evidence of Harlow's involvement with the burglaries. At the time of his arrest, Harlow was in possession of gloves which had a beading pattern that matched impressions found at two of the crime scenes. Additionally, Price admitted to committing the burglaries with a single accomplice and Harlow made multiple statements, which we have detailed above, in which he implicated himself as having taken part in the crimes with Price. Price testified that after each burglary Harlow accompanied her to local pawn shops where the two sold the stolen goods. The jury saw video of Harlow carrying one of the

[30] televisions stolen from Mullins's home into the pawn shop on the same day Mullins's residence was burglarized. The State also provided receipts from two pawn shops at which Harlow pawned several of the stolen items. As opposed to *Kidd*, Harlow's possession of the stolen goods in this case was not the sole evidence. Furthermore, Harlow was in possession of goods stolen from *multiple* residences, as opposed to the single burglary in *Kidd*, making the inference of guilt stronger in this case. As such, the evidence here is sufficient to create a reasonable inference of Harlow's guilt.[1]

---

[1] Harlow also claims that because the evidence is insufficient, the trial court erred by denying his motion for judgment on the evidence. However, "if the evidence is sufficient to support a conviction on appeal, then the trial court's denial of a Motion for a Directed Verdict cannot be in error." *Huber v. State*, 805 N.E.2d 887, 890

# III. Appropriateness of Sentence

[31] "Ind. Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the offender." *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*. "An appellant bears the burden of showing both prongs of the inquiry favor revision of her sentence." *Id.* (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

[32] The entirety of Harlow's Rule 7(B) argument is as follows:

> In the present case, and as reflected in Defendant's presentence investigation report, mitigating circumstances relative to sentencing are not available to Harlow. However, based upon the specious "evidence" upon which Harlow was convicted of 56 years is grossly excessive. Harlow requests this court exercise its discretion in appellate rule 7B in revisiting the sentence.

Appellant's Br. p. 23. Harlow has failed to argue either prong of the Rule 7(B) analysis and as such has waived the argument. *See Day v. State*, 898 N.E.2d 471, 472 (Ind. Ct. App. 2008) (holding that defendant waived her Rule 7(B) argument by failing to cite to relevant authority or explain why the facts relating to the nature of her offense or character are deserving of a lesser sentence).

[33] The judgment of the trial court is affirmed.

---

(Ind. Ct. App. 2004). Because we have determined that there was sufficient evidence to support Harlow's convictions, the trial court necessarily did not err in denying Harlow's motion for a directed verdict.

Vaidik, C.J., and Kirsch, J., concur.