## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 26 2019, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy P. Broden
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Zachary Williams,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 26, 2019

Court of Appeals Case No.
18A-CR-1999

Appeal from the Tippecanoe Superior Court

The Honorable Randy J. Williams, Judge

Trial Court Cause No.
79D01-1607-F3-23

**Bradford, Judge.**

# Case Summary

[1] Zachary Williams was convicted of a number of offenses relating to a July 9, 2016 domestic disturbance involving his then-girlfriend Angelina Hill.[1] During Williams's trial, Angelina acknowledged that her trial testimony differed from her initial statements to police. The State proceeded to question Angelina about the specific discrepancies in her pretrial statements and trial testimony. Defense counsel did not object to the State's line of questioning. Williams contends on appeal that the trial court committed fundamental error by allowing the State to continue to impeach Angelina after she had effectively impeached herself by admitting that she had lied. While we agree that the State should not have been permitted to continue to question Angelina in the manner it did once she had impeached herself, we conclude that the trial court's error did not amount to fundamental error. In addition, to the extent that Williams also contends that the trial court committed fundamental error during the parties' closing arguments, Williams has failed to demonstrate that the trial court erred, much less committed fundamental error. We affirm.

# Facts and Procedural History

[2] On July 9, 2016, Williams and Angelina became involved in an argument. While Angelina and Williams were arguing inside Angelina's home, Angelina's

---

[1] Angelina and Williams have subsequently married and Angelina now goes by "Angelina Williams."

daughter and a friend were playing at the park across the street. Angelina and Williams continued to fight as they came outside and made their way across the street to where Angelina's daughter and friend were playing. After Angelina and Williams came outside, Angelina's daughter asked her neighbor's son to call police because Angelina and Williams "were getting out, too out of hand." Tr. p. 48. Angelina's neighbor and her teenage son also heard Angelina and Williams arguing and observed Williams run after Angelina and strike her on the head or back with a closed fist. The neighbor's son called 911 and the police arrived a short time later.

[3] Lafayette Police Officer Jacob Daubenmier was the first to arrive at Angelina's home. When he arrived, he observed that Angelina had red marks and scratches on her neck and "a raspy voice." Tr. p. 109. Officer Daubenmier called for medical attention for Angelina. He subsequently accompanied Angelina to the hospital. Once at the hospital, Angelina also indicated that she had sustained bruising on her breast. Based on the injuries he observed on Angelina, Officer Daubenmier determined that there was probable cause to arrest Williams.

[4] As Lafayette Police Officer Zachary Hall neared Angelina's home, he observed Williams walking southbound from the area of Angelina's home and stopped to speak with Williams. Officer Hall observed that Williams "was a little sweaty" and had "a small rip in [his] shirt on the left side." Tr. p. 83. Williams told Officer Hall that he and Angelina had argued over "a set of car keys belonging to [their] vehicle." Tr. p. 83. Williams indicated that he had not been hurt

during the altercation. As he was speaking to Williams, Officer Hall "overheard through [his] ear piece another officer tell [him] that they had probable cause to arrest [Willilams], so at that point I directed another officer to place him and detain him in handcuffs." Tr. p. 84. Following his arrest, Officers recovered a set of car keys from Williams's "right front pants pocket." Tr. p. 84.

[5] Officer Hall then made his way to Angelina's home. After arriving at the scene, Officer Hall was directed by another officer to look for a handgun in the yard of an unoccupied neighboring home. In the backyard of the neighboring home, Officer Hall found a gun "laying inside" a piece of flashing "for a roof … [that would] go around … a ventilation pipe, that was turned over" in tall grass near the back fence line of the property. Tr. p. 86. Officer Hall observed that although there was some vegetation on top of the gun, "[t]here was no rust" on the gun and it "didn't appear weathered, like it had been out in the weather, the elements for a longer period of time." Tr. p. 91. The gun was loaded with at least one cartridge "chambered into the firearm." Tr. p. 91. Subsequent DNA and fingerprint tests were unable to conclusively link the gun to Williams.

[6] On July 13, 2016, Williams was charged with Level 3 felony confinement, Level 4 felony unlawful possession of a firearm by a serious violent felon, Level 5 felony intimidation, Level 6 felony strangulation, and Class A misdemeanor battery resulting in bodily injury. A no-contact order was issued barring Williams from contacting Angelina. Despite this no-contact order, in early

2017, Angelina and Williams married and Williams began living with Angelina.

[7] During a pre-trial conference, the deputy prosecutor acknowledged that while Angelina was not being called to testify solely for the purpose of impeachment, he was unsure of whether she was "going to be cooperative or not" and indicated that if she was uncooperative, he could see potentially having to impeach her. Tr. p. 9. Specifically, the deputy prosecutor indicated as follows:

> So the State could see a potentiality of which we might have to impeach her, recognize we cannot produce a witness solely for the purpose of impeachment but at this time I don't know that she's going to get on the stand and, and say something different than what she said the previous three times we've spoken to her but it's—recognizing it's a possibility. The reason that's a possibility is because of all the violations of the no contact order and the fact that she's been living with the defendant during the pendency of this case and I would note that, uh, I believe the statute states that (inaudible) producing a witness may impeach the credibility of the witness if it was indispensable that the party, party produce the witness and that obviously, her being the victim in this case, she's fairly indispensable.

Tr. pp. 9–10. In response, defense counsel stated that "I expect they will be impeaching their own witness" and indicated that he did not foresee it being an issue so long as "it's done properly." Tr. p. 10.

[8] Trial began on May 6, 2017. During Angelina's direct examination, the deputy prosecutor's suspicions came true with Angelina giving testimony that was different than her pretrial statements to police and the prosecution. Angelina

herself acknowledged that her testimony was different than her previous statements. The deputy prosecutor requested and defense counsel agreed that Angelina should be qualified as a hostile witness. The trial court granted the deputy prosecutor's request and direct examination continued.

[9] Angelina acknowledged that she had previously told police that Williams had "grabbed [her] by the neck and nearly picked [her] up off the ground[;]" "got physical with [her], including grabbing [her] right breast and squeezing it, twisting i[t;]" and "ran across the street, knocked [her] down and pulled a firearm on [her]." Tr. p. 63. Angelina, however, backed away from these statements at trial, testifying that Williams had not had a firearm. Angelina indicated that she told police that Williams had a gun because she was really angry with Williams for "arguing with me and fighting with me over something … so petty and materialistic." Tr. p. 73. Angelina acknowledged that the police recovered a gun from near her residence following the incident. However, in testifying that this gun did not belong to Williams, Angelina explained that it had been left in the area near her home by one of Williams's friends who had visited her home.

[10] During closing argument, Williams requested that the jury find him not guilty of all crimes relating to possession of the gun, noting that Angelina had admitted during trial that she lied to police when she told them that the gun belonged to Williams. For its part, the State repeatedly suggested that Williams had tried to "sabotage" the case by continuing his involvement with Angelina. Tr. pp. 162, 174. Defense counsel objected to the State's classification of

Williams's continued relationship with Angelina as an attempt to "sabotage" the State's case. The trial court sustained defense counsel's objection and stated the following: "Ladies and gentleman as to the term sabotage, you're not, obviously, anything that counsel says is not evidence in any event, but counsel is going to be instructed not to use that term. Thank you." Tr. p. 174.

[11] Following deliberations, the jury found Williams guilty of Level 3 felony confinement, Class A misdemeanor carrying a handgun without a license, Level 5 felony intimidation, Level 6 felony strangulation, and Class A misdemeanor battery resulting in bodily injury. Following a bench trial on the serious violent felon enhancement relating to the firearm charge, the trial court found Williams "not guilty of SV—serious violent felon in possession of a handgun, due to the lack of sufficient evidence in the filed documents." Tr. p. 196. The trial court subsequently sentenced Williams to an aggregate term of four years, ordering that two years be served in the Department of Correction, one year served in the Tippecanoe County Jail, and the remaining year served on Community Corrections.

# Discussion and Decision

## I. State's Manner of Questioning Angelina

[12] Williams contends that the trial court erred in allowing the State to impeach Angelina with the prior statements she gave to police. Specifically, Williams argues that once Angelina admitted that her testimony was inconsistent with her prior statements, she had "impeached herself and line-by-line recitation of

the pretrial statement is superfluous and raises the very real threat that the impeachment evidence will be viewed by the jury as substantive evidence." Appellant's Br. p. 6. Thus, Williams asserts that the trial court should have limited the State's impeachment of Angelina "to her admission that her trial testimony was a considerably different story from what she had told police on July 9, 2016[.]"[2] Appellant's Br. p. 9.

[13] The Indiana Supreme Court has previously held that once a witness has admitted that he made a police statement prior to trial that was inconsistent with his trial testimony, impeachment was complete as the witness had admitted himself a liar. *Appleton v. State*, 740 N.E.2d 122, 126 (Ind. 2001). In such situations, reciting segments of the witness's pretrial statement was therefore superfluous because "[t]he only purpose such recitation could have would be to get the details of [the witness's former statement] before the jury as substantive evidence, the very thing we decided to prohibit." *Id.*

[14] The danger the Indiana Supreme Court sought to protect against in *Appleton* is present in this case, where the trial court allowed the State to question Angelina about the details of her prior statement after she admitted that her trial testimony was different than the pretrial statements she made to police.

---

[2] We note that Williams does not argue that the trial court committed fundamental error by allowing Angelina as a witness. While it would have been improper for the State to call Angelina for the sole purpose of introducing otherwise inadmissible evidence cloaked as impeachment evidence, *see Herron v. State*, 10 N.E.3d 552, 556 (Ind. Ct. App. 2014), a review of the record reveals that impeachment was not the State's sole purpose for calling Angelina as a witness.

Williams, however, did not object to the admission of this line of questioning at trial. We will therefore only reverse if the admission of this evidence amounted to fundamental error.

> An error is fundamental, and thus reviewable on appeal, if it made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm. These errors create an exception to the general rule that a party's failure to object at trial results in a waiver of the issue on appeal. This exception, however, is extremely narrow and encompasses only errors so blatant that the trial judge should have acted independently to correct the situation. At the same time, if the judge could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error.

*Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (internal citation and quotations omitted). Williams effectively argues that the trial court committed fundamental error because the court should have acted independently and disallowed the State's line of questioning relating to Angelina's pretrial statements. Upon review, we cannot say that the trial court's alleged error was blatant enough to constitute fundamental error because we recognize viable reasons for defense counsel's decision to refrain from objecting to the problematic line of questioning.

[15] In admitting that she had described Williams's alleged actions differently when giving her pre-trial statements to police, Angelina indicated that she had crafted her initial statements to police in the manner she did because she was mad at

Williams and hoped he would get in trouble. Specifically regarding her earlier allegations that Williams had pointed a gun at her, Angelina testified that although she told police that he had pointed a loaded gun at her, he had not had a gun. When asked why she told police that Williams had had a gun, she stated:

> Because I was so angry at him for even arguing with me and fighting with me over something over so petty and materialistic and we just, like I said, we had, I thought we had a better relationship at that time than that and I was really upset with him and I wasn't going to allow him to take my truck and leave me stranded with my kids and so I said what I said to try to get him in trouble.… I did tell the officer that he did have a gun at the time.… I told them I believed it was outside somewhere like around my house, the neighbor's house.

Tr. pp. 73–74. Angelina also provided testimony indicating that the gun recovered by officers following the altercation did not belong to Williams. Angelina explained that the gun had been left in an area near her home "probably a week prior" to the incident by one of Williams's friends who was visiting the home. Tr. p. 60. Specifically, Angelina testified that after the friend showed the gun to her and Williams, she made the friend put the gun outside, telling him that she did not like guns and did not want them in her house. She further explained that the friend must have left the gun because he "didn't want to drive with a gun because he lived out of town." Tr. p. 60.

[16] While we agree that it was error to allow the State to question Angelina about the specifics of her pretrial statements after she effectively impeached herself by

admitting that her pretrial statements differed from her trial testimony, we conclude that the record presents viable reasons why an effective attorney might not object to the line of questioning. For instance, defense counsel might reasonably have wanted the jury to hear Angelina's admission that she had lied to police because she was mad at Williams as this admission could potentially lead the jury to question the truthfulness of Angelina's other allegations against Williams. Defense counsel might also reasonably have wanted the jury to hear an alternative explanation for the presence and Angelina's knowledge of the presence of the gun besides the State's proffered inference that the gun belonged to Williams. No other eyewitness observed the gun or made any statements to police about a gun. Forensic testing was also unable to connect Williams to the gun. It is entirely possible that defense counsel made the tactical decision to allow the line of questioning as it called into doubt the State's case against Williams, specifically its claim that Williams had committed the alleged offenses while in possession of a gun. As such, we conclude that the trial court's error in allowing the line of question is not "blatant enough" to constitute fundamental error. *Durden*, 99 N.E.3d at 652.

## II. State's Use of the Word "Sabotage" During Closing Argument

[17] To the extent that Williams argues that the trial court also committed fundamental error by allowing the State to portray his continued relationship with Angelina as an act of sabotage against the State, we note that defense counsel objected to use of this term, the trial court instructed the jury that the

deputy prosecutor's statements were not evidence, and instructed the deputy prosecutor to refrain from using the word. Williams has failed to explain how the trial court's actions in this regard amounted to error, much less fundamental error. *See generally Tharpe v. State*, 955 N.E.2d 836, 842 (Ind. Ct. App. 2011) ("We presume juries follow the admonitions of the court and admonitions cure any prejudice resulting from an error.")

[18] The judgment of the trial court is affirmed.

Bailey, J., and Brown, J., concur.